Filed 8/25/15

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF CERRITOS et al., | C070484 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201180000952CUWMGDS) |
| v. | |
| STATE OF CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Lloyd G. Connelly, Judge.  Affirmed and remanded for further proceedings.

Rutan & Tucker, Jeffrey M. Oderman, Dan Slater, Mark J. Austin, and William H. Ihrke for Plaintiffs and Appellants.

Goldfarb & Lipman, Juliet E. Cox for amicus curiae on behalf of Appellant League of California Cities.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Peter A. Krause and Peter K. Southworth, Supervising Deputy Attorneys General, Ross C. Moody and Seth E. Goldstein, Deputy Attorneys General, for Defendants and Respondents.

Plaintiffs are a group of cities in their municipal capacities and the successor agencies to several redevelopment agencies that have since been dissolved, multiple community development commissions, a private nonprofit housing corporation, and an individual taxpayer. Specifically, plaintiffs are the City of Cerritos, City of Carson, City of Cypress, City of Lakewood, City of Paramount, City of Placentia and City of Signal Hill, each in their municipal capacities and as the successor agencies to their respective former redevelopment agencies, as well as the City of Commerce, Commerce Community Development Commission, City of Downey, Community Development Commission of the City of Downey, City of Santa Fe Springs, Community Development Commission of the City of Santa Fe Springs, Cuesta Villas Housing Corporation, and Bruce W. Barrows.

Plaintiffs filed a combined complaint for injunctive and declaratory relief and petition for writ of mandate challenging the constitutionality of Assembly Bill 26 and Assembly Bill 27, which laid the groundwork for the demise of California's nearly 400 redevelopment agencies in order to partially address a declared fiscal emergency in 2011. (Assem. Bill Nos. 26 & 27 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, chs. 5-6 (hereafter Assembly Bill 1X 26 and Assembly Bill 1X 27); *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 241 (*Matosantos I*).) The legislation was intended to reduce or eliminate the redevelopment agencies' diversion of property tax revenues from school districts thereby relieving pressure on the state to backfill educational funding requirements under Proposition 98. (*Id.* at pp. 241-242, 245.)

The Supreme Court, in *Matosantos I*, declared Assembly Bill 1X 26 constitutional and a valid exercise of the Legislature's power. It struck down Assembly Bill 1X 27, which would have allowed redevelopment agencies to continue operating under certain conditions. (*Matosantos I, supra,* 53 Cal.4th at p. 242.) As reformed by the court, Assembly Bill 1X 26 required all redevelopment agencies to dissolve effective

2

February 1, 2012.  (*Id.* at pp. 275-276; *City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1463 [characterizing Assembly Bill 1X 26 as the "Great Dissolution"].)

Plaintiffs then sought a preliminary injunction in Sacramento County Superior Court to enjoin Assembly Bill 1X 26 on additional constitutional grounds not considered in *Matosantos I*.  (*Matosantos I, supra,* 53 Cal.4th at p. 242, fn. 2.)  The trial court denied plaintiffs' preliminary injunction request concluding they were unlikely to prevail on the merits.  On February 1, 2012, the dissolution and wind down procedures commenced. (*Id.* at p. 275.)  That process continues today.

On appeal, plaintiffs argue Assembly Bill 1X 26 violates at least seven different constitutional provisions.

Although additional parties were originally named in plaintiffs' complaint and petition, only defendants the State of California and the Director of Finance in her official capacity filed a brief in this appeal (the State).

The State argues plaintiffs' challenge is moot because redevelopment agencies have been dissolved.  While we disagree that dissolution of the state's redevelopment agencies moots this appeal, we nevertheless reject plaintiffs' constitutional challenges to Assembly Bill 1X 26.

We note that amicus curiae League of California Cities raises additional arguments that the Department of Finance is applying Assembly Bill 1X 26 and Assembly Bill No. 1484 (hereafter Assembly Bill 1484), which amended portions of Assembly Bill 1X 26 effective June 27, 2012 (Stats. 2012, ch. 26.), in an unconstitutional manner.  We do not consider these expanded arguments and deny the League's request for judicial notice.  (*Matosantos I, supra,* 53 Cal.4t at p. 242, fn.2.)

We affirm the trial court's order denying the preliminary injunction.

A.      *Redevelopment Agencies and Tax Increment Financing Generally*

The historical underpinnings of California's redevelopment agencies were discussed in *Matosantos I* and several cases since the Supreme Court's landmark decision and need no further exposition here.  (See generally *Matosantos I, supra,* 53 Cal.4th at pp. 245-248; see also *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1464-1473 (*Matosantos II*).)  Briefly summarized, since the 1940's, the Community Redevelopment Law allowed sponsoring cities and counties to establish redevelopment agencies to address urban blight.  (See Legis. Analyst's Off., Governor's Redevelopment Proposal (Jan. 18, 2011) p. 1; see also Stats. 1945, ch. 1326, p. 2478 et seq. [Community Redevelopment Act]; Stats. 1951, ch. 710, p. 1922 et seq. [codifying and renaming the Community Redevelopment Law, Health & Saf. Code, § 33000 et seq.]; unless otherwise stated, statutory references that follow are to the Health and Safety Code.)  A redevelopment agency was a separate legal entity from the city or county that established it.  (*County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1267 ["A redevelopment agency is a public body, corporate and politic, which may sue, be sued, and make contracts," and is a separate legal entity from its sponsoring agency].)

Redevelopment agencies generally could not levy taxes, and, instead, relied primarily on tax increment financing as a funding source as authorized by Article XVI, section 16 of the California Constitution and Health and Safety Code section 33670.  (*Matosantos I, supra,* 53 Cal.4th at p. 246.)  Under that funding mechanism, redevelopment agencies received the growth in property taxes from a designated redevelopment plan area, known as the property tax increment, while the other public entities entitled to receive property tax revenue in the redevelopment area were allocated a portion based on the assessed value of the property prior to the effective date of the

4

redevelopment plan (known as the frozen base). (*Id.*at pp. 246-247; Cal. Const., art. XVI, § 16, subds. (a), (b); § 33670.)

By 2011, California's redevelopment agencies were receiving approximately 12 percent of statewide property tax revenues. (See Legis. Analyst's Off., Governor's Redevelopment Proposal (Jan. 18, 2011) p. 1.) It was further estimated that redevelopment agencies would divert approximately $5 billion of property tax revenue annually that would otherwise fund school districts, cities, counties, and special districts. Under negotiated agreements and state statute, redevelopment agencies "pass[ed]through" about $1.1 billion to local agencies; a portion of this amount was passed to schools. The state General Fund, however, had to backfill the remaining property tax revenues diverted from K-14 schools, at a cost of over $2 billion annually.

B.     *The 2011 Fiscal Crisis*

Faced with a budget gap of more than $25 billion, on January 20, 2011, incoming Governor Jerry Brown renewed a previously declared state fiscal emergency and convened a special session of the Legislature to address the state's budget crisis. (*Matosantos I, supra,* 53 Cal.4th at p. 250 [citing Legis. Counsel's Digest, Assem. Bill 1X 26 and *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1001-1002 [detailing the ongoing crisis] (*Professional Engineers*)].) To partially close the state's projected $25 billion operating deficit, Governor Brown proposed eliminating redevelopment agencies entirely. (See Legis. Analyst's Off., The 2011-2012 Budget:  Should California End Redevelopment Agencies? (Feb. 9, 2011) p. 1 ["The Governor's 2011-12 budget includes a plan for dissolving redevelopment agencies and distributing their funds (above the amounts necessary to pay outstanding debt) to other local agencies"]; see also Governor's Budget Summary – 2011-2012 (Jan. 10, 2011) p. 171 ["The Budget prohibits existing [redevelopment] agencies from creating new contracts or obligations effective upon enactment of urgency legislation. By July 1,

existing agencies would be disestablished and successor local agencies would be required to use the property tax that RDAs would otherwise have received to retire RDA debts and contractual obligations in accordance with existing payment schedules"].)

It was projected that dissolving redevelopment agencies would produce approximately $1.7 billion in revenue to offset State general fund costs for the 2011-2012 fiscal year.

C.   *Assembly Bill 1X 26 and Assembly Bill 1X 27*

Responding to the declared fiscal emergency, the Legislature passed Assembly Bill 1X 26 and Assembly Bill 1X 27 during the special legislative session. (*Matosantos I, supra,* 53 Cal.4th at p. 241.) Among other things, Assembly Bill 1X 26 barred redevelopment agencies from incurring new or expanding existing monetary or legal obligations. (See Health & Saf. Code, Part 1.8 (§§ 34161 to 34169.5) [the freeze component restricting redevelopment agency powers].) It also provided for their windup and dissolution. (See Health & Saf. Code, Part 1.85 (§§ 34170 to 34191) [the dissolution component dissolving redevelopment agencies and transferring control of their assets to successor agencies].) We address relevant portions of Assembly Bill 1X 26 in more detail below.

Assembly Bill 1X 27 offered an exemption from dissolution for sponsoring agencies that agreed to make specified payments to both the applicable county educational revenue augmentation funds (ERAF's) and a new county special district augmentation fund on behalf of their redevelopment agencies. (See Health & Saf. Code, Part 1.9 (§§ 34192 to 34196).) If the payments were timely made, the sponsoring agency's redevelopment agency would be permitted to continue operating under the Community Redevelopment Law. (§ 34193, subd. (a).) Failure to make timely payments resulted in a redevelopment agency's dissolution. (§ 34195.)

6

D.    *The Supreme Court Holds Assembly Bill 1X 26 Does Not Violate the California Constitution*

The California Redevelopment Association, the League of California Cities and other affected parties challenged the constitutionality of Assembly Bill 1X 26 and Assembly Bill 1X 27. (*Matosantos I, supra,* 53 Cal.4th at pp. 241-242.)   The Supreme Court upheld Assembly Bill 1X 26 as a valid exercise of the Legislature's power but struck down Assembly Bill 1X 27 as unconstitutional. (*Id.* at p. 242.)  Regarding Assembly Bill 1X 26, the Supreme Court specifically found it did not violate either Article XVI, section 16, or Proposition 22, which added Article XIII, section 25.5, subdivision (a)(7) to the California Constitution. (*Ibid.*)

Plaintiffs filed an amicus brief in *Matosantos I*, but did not intervene in the action. (*Matosantos I, supra,* 53 Cal.4th at pp. 241-242.)  Plaintiffs' amicus brief generally raised the same constitutional infirmities plaintiffs allege here.  The Supreme Court declined to consider their arguments. (*Id.* at p. 242, fn. 2.)

E.    *Plaintiffs' Motion for Preliminary Injunction*

Shortly after the Supreme Court decided *Matosantos I*, plaintiffs filed a motion for preliminary injunction to stay the enforcement of Assembly Bill 1X 26 in the present proceedings.  Plaintiffs argued Assembly Bill 1X 26 was unconstitutional under the following provisions of the state Constitution:  (1) article XIII, section 25.5, subdivision (a)(3) (hereafter Article XIII, section 25.5(a)(3) or Proposition 1A); (2) article IV, section 12, subdivisions (d) and (e) (hereafter Article IV, section 12(d) and Article IV, section 12(e) or Proposition 25); (3) article IV, section 9 (hereafter Article IV, section 9 or the single subject rule); (4) article IV, section 3, subdivision (b) (hereafter Article IV, section 3(b)); (5) article IV, section 12, subdivision (c)(4) (hereafter Article IV, section 12(c)(4)); and (6) that it violated the Contracts Clauses of both the federal and state constitutions.

Following expedited briefing, the trial court denied the motion. In so doing, the court found plaintiffs were unlikely to prevail on the merits of their claims. Plaintiffs appealed and also sought writ relief in this court, which we denied.

On appeal, plaintiffs renew their constitutional claims except those under the federal and state Contracts Clauses. They also assert a new argument--that Assembly Bill 1X 26 violates the home-rule doctrine found in article XI, section 5 (hereafter Article XI, section 5).

Plaintiffs' requests for judicial notice filed in support of their opening and reply briefs are denied.

I

*The Appeal is Not Moot*

We begin by addressing the effect, if any, of the dissolution of redevelopment agencies under Assembly Bill 1X 26 on February 1, 2012. We must decide whether this moots plaintiffs' appeal.

"Generally, courts decide only 'actual controversies' which will result in a judgment that offers relief to the parties." (*Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174, 1178.) "Thus, appellate courts as a rule will not render opinions on moot questions[.]" (*Id.* at p. 1178.) "A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief." (*Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503.) An appeal from an order denying an injunction may be dismissed as moot if the act sought to be enjoined is performed while the appeal is pending. (*Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 10-11 [appeal moot where special election sought to be enjoined occurred while appeal pending].) But, where a court can afford the party at least some relief, even if not all the relief originally requested, the court should not dismiss a case as

8

moot.  (*Hartke v. Abbott* (1930) 106 Cal.App. 388, 395 ["where there is left any material or vital question for determination . . . the court should not dismiss the appeal but should permit it to be heard on the merits"]; *Sahlolbei v. Providence Healthcare, Inc.* (2003) 112 Cal.App.4th 1137, 1156-1157 [injunctive relief is still available where a defendant's completed act causes ongoing harm or is part of a continuing course of conduct].)

In this case, the parties dispute the effect of dissolving redevelopment agencies. Because the event plaintiffs sought to enjoin--redevelopment agency dissolution --has occurred and redevelopment agencies have ceased to exist, the State argues the appeal is now moot.  The State points to plaintiffs' own dire prognostications in the court below as evidence that passage of the dissolution deadline moots the matter.  Plaintiffs claimed at the preliminary injunction hearing, "[w]e're gone.  Once our -- the agencies dissolve. Once their assets are stripped from them and sent to the county auditor-controllers, there is no way to undo that.  So our harm is total and permanent."  They made similar concessions in their written papers in the trial court.

Retreating from their earlier predictions, plaintiffs now contend this court *can* provide them with relief even though redevelopment agencies have been dissolved. Equity lies, they argue, to reinstate the *status quo ante*, meaning before Assembly Bill 1X 26 was enacted.  According to plaintiffs, redevelopment agencies can be reactivated and their powers restored "by the stroke of a (court's) pen."

But, plaintiffs argue, even if such an undertaking is impossible as a practical matter given the passage of time and given the fact that redevelopment agency assets and monies have already been disbursed to other entities not joined as parties to this appeal (*Save Our Bay, Inc. v. San Diego Unified Port Dist.* (1996) 42 Cal.App.4th 686, 692 [a party is indispensable where the plaintiff seeks some type of affirmative relief which, if granted, would injure or affect the interest of a third party not joined]); *Washington Mutual Bank v. Blechman* (2007) 157 Cal.App.4th 662, 667-668 ["[a]n ' "indispensable party is not bound by a judgment in an action in which he was not joined" ' "]), plaintiffs

9

argue other relief is nonetheless available.  Noting that the so-called "waterfall payment" provisions contained in Health and Safety Code sections 34183 and 34188, which plaintiffs allege improperly reallocate ad valorem property taxes to local agencies on something other than a pro rata basis, are intended to operate in the future, plaintiffs contend the court could conceivably reform the provisions to provide them with more money going forward.

Because the redevelopment agency wind-down procedures in Assembly Bill 1X 26 will occur over the course of many years, we could theoretically craft a remedy to provide plaintiffs with at least some relief if certain challenged provisions are deemed unconstitutional.  (See e.g., *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 660-661 ["a court may reform--i.e., 'rewrite'--a statute in order to preserve it against invalidation under the Constitution, when we can say with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute"].)  The appeal, then, is not moot even though the dissolution deadline has passed and redevelopment agencies were dissolved under the terms of Assembly Bill 1X 26 on February 1.  (See *Matosantos II, supra,* 212 Cal.App.4th at pp. 1483-1485 [action not moot even though scheduled fund transfers from redevelopment agencies had already occurred and redevelopment agencies had since been dissolved under Assembly Bill 1X 26 since potential money judgment against Legislature would inure to the benefit of successor agencies].)

II

*Standard of Review*

Before considering the merits of plaintiffs' claims, we identify the applicable standard governing our review of the order denying plaintiffs' motion for preliminary injunction.  Ordinarily, in ruling on a preliminary injunction request "a trial court must

10

consider the likelihood that the plaintiff will prevail on the merits at trial and weigh the interim harm to the plaintiff if the injunction is denied against the harm to the defendant if the injunction is granted." (*Miller v. City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1138 (*Miller*).) The appropriate standard of review depends on whether the trial court engaged in both prongs of the analysis. (*Ibid.*)

When the trial court addresses both the likelihood of success and the relative harms, an order granting or denying a preliminary injunction will be reversed only for abuse of discretion. (*Miller, supra,* 13 Cal.App.4th at p. 1138.) Where, however, the trial court considers only the legal issue of likelihood of success on the merits, the appeal presents a question of law which we review de novo. (*Ibid.*)

While the parties argued both the likelihood of success on the merits and the relative harms at the preliminary injunction hearing, the trial court's ruling focused solely on plaintiffs' likelihood of prevailing at trial. Our review, then, is de novo.

Turning now to the merits, "we are mindful that 'all intendments favor the exercise of the Legislature's plenary authority: "If there is any doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action. Such restrictions and limitations [imposed by the Constitution] are to be construed strictly, and are not to be extended to include matters not covered by the language used." [Citations.]' " (*Matosantos I, supra,* 53 Cal.4th at p. 253 [citing *Methodist Hosp. of Sacramento v. Saylor* (1971) 5 Cal.3d 685, 691].)

III

*Article XIII, Section 25.5(a)(3) - Pro Rata Share of Ad Valorem Property Taxes*

Plaintiffs' primary contention on appeal is that Assembly Bill 1X 26 violates Proposition 1A, which the electorate approved at the general election in November 2004. (Stats. 2004, res. ch. 133.) Proposition 1A added Article XIII, section 25.5(a)(3) to the state Constitution. (*Matosantos II, supra,* 212 Cal.App.4th at p. 1467.) That section

11

generally "prohibits the Legislature from raiding local property tax allocations to help balance the budget." (*Ibid.*) It provides in relevant part: "(a) On or after November 3, 2004, the Legislature shall not enact a statute . . . (3) . . . chang[ing] for any fiscal year the pro rata shares in which ad valorem property tax revenues are allocated among local agencies in a county other than pursuant to a bill passed in each house of the Legislature by rollcall vote entered in the journal, two-thirds of the membership concurring." (Cal. Const., art. XIII, § 25.5, subd. (a)(3).) Its protections, however, do not apply to redevelopment agencies. (*Matosantos I, supra,* 53 Cal.4th at p. 249; Cal. Const., art. XIII, § 25.5, subd. (b)(2); Rev. & Tax. Code, § 95, subds. (a) [omitting redevelopment agencies from the definition of local agency] & subd. (m) [excluding from the definition of "special district" "any agency that is not authorized by statute to levy a property tax rate"].)

Despite this, plaintiffs claim Assembly Bill 1X 26, which governs the dissolution and wind down of redevelopment agencies, allocates ad valorem property taxes to local agencies on a non-pro rata basis without having been passed by a two-thirds supermajority as Article XIII, section 25.5(a)(3) requires. Whether Assembly Bill 1X 26 violates Proposition 1A requires us to interpret not only the constitutional provision, but also the statutory framework enacted by the bill.

A.      *Principles of Statutory Construction*

"The rules governing statutory construction are well established. Our objective is to ascertain and effectuate [the] legislative intent." (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 463, 468; see also *Mejia v. Reed* (2003) 31 Cal.4th 657, 663 (*Mejia*).) The same rules of construction apply when interpreting a voter initiative. (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900-901, as modified (Aug. 20, 2003) (*Robert L.*).)

In determining legislative or voter intent, we first look to the language itself. (*Mejia, supra,* 31 Cal.4th at p. 663.)  "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.)  "But, the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose. . . ." (*Ibid.*)  Moreover, " 'where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice.' [Citation.]" (*People ex rel. San Francisco Bay Conservation & Developemnt Com. v. Emeryville* (1968) 69 Cal.2d 533, 543-544.)

When the language is ambiguous, we refer to other indicia of legislative or voter intent such as legislative history, public policy, or analyses and arguments contained in the official ballot pamphlet. (*Robert L. supra,* 30 Cal.4th at pp. 900-901; *Hoechst Celanese Corp. v. Franchise Tax Bd.* (2001) 25 Cal.4th 508, 519.)  Our task is simply to interpret and apply the language of a statute or initiative so as to effectuate the Legislature's or electorate's respective intent.  (*Ibid.*)

Courts must also construe words in context, "keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 (*Dyna-Med*).)  Every statute, then, should be construed in light of the whole system of law of which it is a part, so that all may be harmonized and have effect. (*Mejia, supra,* 31 Cal.4th at p. 663.)

Finally, it is established that where " ' "the terms of a statute are by fair and reasonable interpretation capable of a meaning consistent with the requirements of the Constitution, the statute will be given that meaning, rather than another in conflict with the Constitution." ' " (*People v. Davenport* (1985) 41 Cal.3d 247, 264 (*Davenport*); see

13

also *United States ex rel Atty. Gen. v. Delaware and Hudson Co.* (1909) 213 U.S. 366, 407-408 [53 L.Ed. 836, 849 ["where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter"].) This rule flows from the assumption that the legislative body intended to enact a valid statute. (*Davenport, supra,* 41 Cal.3d at p. 264.) "We presume that the Legislature understands the constitutional limits on its power and intends that legislation respect those limits." (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 129 [superseded by statute on other grounds] (*Kraus*).)

B.      *General Overview of Assembly Bill 1X 26*

To understand the parties' competing arguments, an overview of Assembly Bill 1X 26's complex statutory framework is first in order. As previously noted, the bill contained two components: (1) a "freeze" component (Part 1.8 [§§ 34161-34169.5]), and (2) a "dissolution" component (Part 1.85 [§§ 31470-34191]). (*Matosantos I, supra,* 53 Cal.4th at pp. 250-251.) The "freeze" component subjects redevelopment agencies to restrictions on new bonds or other indebtedness; new plans or changes to existing plans; and new partnerships, including joint powers authorities. (§§ 34162-34165.) The purpose of the freeze component was to preserve redevelopment agency assets. (*Matosantos I, supra,* 53 Cal.4th at p. 250.)

The "dissolution" component dissolved redevelopment agencies and transferred control of redevelopment agency property and assets to successor agencies. (§§ 34172, subd. (a)(1) [dissolving development agencies]; 34175, subd. (b) [transferring former redevelopment agency assets to successor agencies].) With limited exceptions, the city or county that created the redevelopment agency serves as the successor agency. (§§ 34171, subd. (j) [defining "successor agency"]; 34173, subd. (a) [designating successor agencies as "successor entities for the former redevelopment agencies"].)

14

A successor agency is a distinct legal entity from the city or county that provides for its governance. (§ 34173, subd. (g) (Assem. Bill 1484, Stats. 2012, ch. 26, § 6) [clarifying that a successor agency is a separate public entity from the city or county that provides for its governance].)[1] Except for those provisions of the Community Redevelopment Law that Assembly Bill 1X 26 "repealed, restricted, or revised pursuant to the act adding this part, all authority, rights, powers, duties, and obligations previously vested with the former redevelopment agencies, under the Community Redevelopment Law," vest in the successor agencies. (§ 34173, subd. (b).)

Assembly Bill 1X 26 sets forth detailed procedures for successor agencies to satisfy the former redevelopment agencies' "enforceable obligations" and wind down their affairs. (§§ 34171, subds. (d) & (j), 34173, 34177, 34178.) Successor agencies, under the supervision and direction of newly formed "oversight boards" (§ 34179, subd. (a)), are required, among other things, to dispose of redevelopment agency assets, cease performing or terminate all agreements that do not qualify as enforceable obligations, terminate certain agreements if doing so would be in the best interest of the taxing entities, and determine whether private party agreements should be terminated or renegotiated to reduce liabilities and increase net revenues to the taxing entities.

---

[1] Effective June 27, 2012, Assembly Bill 1484 amended portions of Assembly Bill 1X 26. (Stats. 2012, ch. 26, §§ 2-35.) "A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922.) We consider Assembly Bill 1484's minor revisions to the definition of "successor agency" a clarification of, rather than a change to, the definition enacted under Assembly Bill 1X 26. We recognize that under different circumstances, other provisions of Assembly Bill 1484 may have changed the law as it existed under Assembly Bill 1X 26. (See e.g., *County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42 [recognizing Assembly Bill 1484 changed law regarding the ability of a successor agency to reenter into agreements between the former redevelopment agency and its sponsor].)

15

(§§ 34180 [listing successor agency actions requiring oversight board approval]; 34181 [oversight board required to direct successor agencies to conduct various actions].)

County auditor-controllers also play a role in the winding down process. (§§ 34182-34188.) They must create a Redevelopment Property Tax Trust Fund, which constitutes a special fund for purposes of Article XVI, section 16, for the property tax revenues related to each former redevelopment agency. (§§ 34170.5, subd. (b), 34172, subd. (c).) Revenues equivalent to those that would have been allocated to redevelopment agencies as tax increment under Article XVI, section 16, subdivision (b) are allocated to the Redevelopment Property Tax Trust Fund of each successor agency for making payments on the principal and interest on loans, and moneys advanced to or indebtedness incurred by dissolved redevelopment agencies. (§ 34172, subds. (c) & (d).) "Amounts in excess of those necessary to pay obligations of the former redevelopment agency shall be deemed property tax revenues within the meaning of subdivision (a) of Section 1 of Article XIIIA of the California Constitution." (*Ibid.*; § 34177, subd. (d) [successor agencies must "remit unencumbered balances of redevelopment agency funds to the county-auditor controller for distribution to the taxing entities. . . . In making the distribution, the county auditor-controller shall utilize the same methodology for allocation and distribution of property tax revenues provided in Section 34188"].)

Revenues from the Redevelopment Property Tax Trust Fund are disbursed as follows (sometimes referred to as the "waterfall" payment provisions): (1) auditor-controller administrative costs (hereafter Priority 1 payments); (2) statutory and contractual "passthrough" payments to taxing agencies that would have been entitled to them had the RDA not been dissolved (hereafter Priority 2 payments); (3) enforceable obligations, as defined in section 34171, subdivision (d) (hereafter Priority 3 payments); (4) successor agency administrative costs (hereafter Priority 4 payments); and (5) to local agencies and school entities in accordance with their pro rata entitlements to property taxes (hereafter Priority 5 payments). (§§ 34182, subds. (c) & (e); 34183; 34188.) The

16

State Controller is entitled to reimbursement for its costs in auditing and overseeing the Redevelopment Property Tax Trust Fund, and those amounts, if any, are paid before Priority 5 payments. (§ 34183, subd. (d).) With this statutory overview, we turn to the dispute between plaintiffs and the State.

C.    *The Constitutionality of Assembly Bill 1X 26*

To determine whether Assembly Bill 1X 26 violates Proposition 1A, plaintiffs contend we must resolve a single legal question: does redevelopment agency tax increment survive the dissolution of redevelopment agencies?

According to plaintiffs, if tax increment survives redevelopment agency dissolution, then Assembly Bill 1X 26 violates Article XVI, section 16, which authorizes tax increment financing for redevelopment plans, and Article XIII, section 25.5, subdivision (a)(7), which limits what the Legislature may do with an operating redevelopment agency's tax increment.[2] (*Matosantos I, supra,* 53 Cal.4th at pp. 246, 249, 263.) If redevelopment agency tax increment no longer exists after dissolution, which plaintiffs argue is apparent from several provisions in Assembly Bill 1X 26, then, the argument goes, the law purportedly violates Proposition 1A because all taxes redevelopment agencies would have received are now ad valorem property taxes that must be allocated to local agencies on a pro rata basis.

Plaintiffs, however, ask and answer the wrong question. Even if redevelopment agency tax increment no longer exists after redevelopment agency dissolution, the proper inquiry, we believe, is whether Assembly Bill 1X 26 *changed the pro rata shares* of any

---

[2] The Supreme Court has already found that Assembly Bill 1X 26 did not violate either Article XVI, section 16 or Proposition 22, which added Article XIII, section 25.5, subdivision (a)(7). (See *Matosantos I, supra,* 53 Cal.4th at pp. 241-242.) We are bound by the high court's ruling. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

17

taxing entities that receive ad valorem property taxes *within the meaning of Proposition 1A*. Because we find that Assembly Bill 1X 26 did not affect any such change, we conclude the Legislature's statutory scheme to dissolve and wind down redevelopment agencies does not violate Proposition 1A.

Proposition 1A was born out of three major fiscal events that drastically changed California's economic landscape. The first occurred in the 1970's when the California Supreme Court struck down the taxing scheme for school financing because it resulted in inherent inequities in school funding among the various jurisdictions throughout the state. (*Matosantos I, supra,* 53 Cal.4th at p. 243; *Serrano v. Priest* (1971) 5 Cal.3d 584, 608-609; *Serrano v. Priest* (1976) 18 Cal.3d 728, 765-766.) At the time, each local jurisdiction, such as cities, counties, special districts, and school districts, could levy its own property tax. (*Matosantos I* at p. 243.) The Supreme Court's decision threw " 'the division of state and local responsibility for educational funding' " into " ' "a state of flux," ' " and the state eventually "became the principal financial backstop for local school districts." (*Ibid.*)

The second event occurred in 1978 when the electorate adopted Proposition 13, which added Article XIII A to the state Constitution. (*Matosantos I, supra,* 53 Cal.4th at p. 244.) Section 1, subdivision (a) of that article reads: "The maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property. The one percent (1%) tax to be collected by the counties and apportioned according to law to the districts within the counties." (Cal. Const., art. XIII A, § 1, subd. (a).)

Proposition 13 thus replaced the multiple property taxes levied by local governmental agencies and substituted a capped, single tax to be collected by the counties and thereafter apportioned among those entities. (*Matosantos* I, *supra*, 53 Cal.4th at p. 244.) Proposition 13, in effect, "convert[ed] the property tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental

18

grants." (*Ibid.*) It also meant that the property tax pie to be apportioned shrunk considerably--by more than half. (*Id.* at pp. 244-245.)

Following Proposition 13's passage, the Legislature adopted a long-term property tax allocation system that " 'ensured that in any fiscal year, a local government received property tax revenues in an amount equal to what it received in the prior fiscal year (i.e., "base") and its share of the growth in revenue resulting from growth in assessed value within its boundaries (i.e., "increment").' " (*City of Scotts Valley v. County. of Santa Cruz* (2011) 201 Cal.App.4th 1, 34; *City of Alhambra v. County of Los Angeles* (2012) 55 Cal.4th 707, 713 (*City of Alhambra*).) "The sum of these two amounts--the prior year base plus the current year's proportional share of the tax increment--becomes each jurisdiction's new base amount for the following year's calculations." (*City of Alhambra* at p. 713.) "Named after the Assembly bill that originally enacted the fundamental structure of this statutory scheme, this system is commonly referred to as the 'A.B. 8' allocation system. . . ." (*Ibid.*)

The third fiscal event occurred in 1988 when voters approved Proposition 98, which added Article XVI, section 8 to the Constitution. (*Matosantos I, supra,* 53 Cal.4th at p. 245.) That section established a constitutional minimum funding level for education and required the state to designate a portion of the General Fund for public schools. (*Ibid.*) The minimum funding levels were raised two years later. (*Ibid.*)

"The state's ability to meet its increased financial obligation to schools under Proposition 98 was severely tested in fiscal year 1991-1992, when the state 'faced an unprecedented budgetary crisis…with expenditures projected to exceed revenues by more than $14 billion.' " (*Los Angeles Unified School Dist. v. County of Los Angeles* (2010) 181 Cal.App.4th 414, 420.) The Legislature responded to this economic crisis by creating county educational revenue augmentation funds (ERAF's). (*Matosantos I, supra,* 53 Cal.4th at p. 245.) The Legislature exercised its authority to apportion property taxes (Cal. Const., art. XIII A, § 1, subd. (a)), by reducing the property tax allocation of

cities, counties, and special districts, and shifting the amount of the reduction to the ERAF's. (*Matosantos I* at p. 245.) The ERAF's were then deemed part of the state's General Fund for purposes of satisfying its Proposition 98 obligations, and the money was distributed to school districts. (*Ibid.*) Because local governments had no vested right to property taxes (*Los Angeles Unified School Dist.* at pp. 420-421), the Legislature could require them to make the ERAF payments. (*Matosantos I* at p. 245.) ERAF shifts were periodically mandated since the ERAF legislation was first enacted in 1992. (*Ibid.*)

It is against this financial backdrop that the electorate passed Proposition 1A in 2004. (*Matosantos I, supra,* 53 Cal.4th at p. 249.) Proposition 1A began as an initiative sponsored by the Legislature. (See Budget Com., Assembly Floor Analysis of Sen. Const. Amend. No. 4 (2003-2004 Reg. Sess.) as amended July 27, 2004, at p. 1 ["Places a Constitutional Amendment to protect local government revenues before the voters at the November 2, 2004 General Election"].)

According to one Assembly Floor Analysis, the measure would "[p]rohibit[] the Legislature from enacting any law on or after November 3, 2004, that would reduce local governments' percentage share of the 1% property tax revenue in any county below what that share would be under existing state law as of November 3." (See Budget Com., Assembly Floor Analysis of Sen. Const. Amend. No. 4 (2003-2004 Reg. Sess.) as amended July 27, 2004, at p. 1.) An analysis by the Senate Rules Committee similarly described the bill as "mak[ing] it more difficult for the Legislature and the Governor to shift property tax revenues from local governments. . . ." (Sen. Rules Com. Analysis of Sen. Const. Amen. No. 4 (2004-2004 Reg. Sess.) as amended July 27, 2004, at p. 1.)

The ballot materials provided to the voters characterized Proposition 1A as "[p]rohibit[ing] the State from reducing local governments' property tax proceeds." (Protection of Local Government Revenues, Gen. Elec. (Nov. 2004) Legis. Counsel's analysis of Sen. Const. Amend. No. 4 at p. 4.) The arguments in favor of the proposed constitutional amendment said it was needed "[t]o stop the State from taking local

20

government funding[,]" and that it "simply ensure[d] that *existing* local tax dollars continue to be dedicated to local services." (*Id.* at p. 8, argument in favor of Sen. Const. Amend. No. 4.)

These materials confirm that Proposition 1A was intended to prevent the Legislature from statutorily reducing the existing allocations of property taxes among cities, counties, and special districts. In essence, it was intended to stop the periodic ERAF shifts of property tax revenues from local agencies to satisfy the State's school funding obligations.

Given the historical context of Proposition 1A and its intended purpose, it becomes readily apparent that Assembly Bill 1X 26 does not violate Proposition 1A. Assembly 1X 26 does not shift property taxes away from local governments. It does the opposite.

Assembly Bill 1X 26 reallocates to successor agencies, which are not local agencies within the meaning of Proposition 1A, the property tax revenues that would have gone to redevelopment agencies had they not been dissolved in order to satisfy indebtedness previously incurred under Article XVI, section 16.[3] (Assem. Bill 1X 26, § 1, subds. (i), (j)(2); § 34172, subds. (c) ["Solely for purposes of Section 16 of Article XVI of the California Constitution, the Redevelopment Property Tax Trust Fund shall be deemed to be a special fund of the dissolved redevelopment agency . . . ."] & (d)

_____

[3] Because redevelopment agencies could not levy taxes (*Matosantos I, supra,* 53 Cal.4th at p. 246), neither can successor agencies. (§ 34173, subd. (b) [recognizing successor agencies are vested only with the "authority, rights, powers, duties, and obligations" of former redevelopment agencies]; § 34173, subd. (g) [successor agencies are separate public entities from the cities and counties providing for their governance].) A necessary corollary of this inherent limitation is that successor agencies, like redevelopment agencies, do not constitute "local agenc[ies]" within the meaning of Proposition 1A. (Cal. Const., art. XIII, § 25.5, subd. (b)(2); Rev. & Tax. Code, § 95, subds. (a), (m) [omitting redevelopment agencies, and, hence, successor agencies, from the definition of local agency].)

21

["Revenues equivalent to those that would have been allocated pursuant to subdivision (b) of Section 16 of Article XVI of the California Constitution shall be allocated to the Redevelopment Property Tax Trust Fund of each successor agency for making payments on the principal of and interest on loans, and moneys advanced to or indebtedness incurred by the dissolved redevelopment agencies. Amounts in excess of those necessary to pay obligations of the former redevelopment agency shall be deemed to be property tax revenues within the meaning of subdivision (a) of Section 1 of Article XIII A of the California Constitution"].) Once such obligations are satisfied, any excess revenues are then allocated to local agencies according to their AB 8 allocations. (§§ 34172, subd. (d); 34188, subd. (a)(1).) Thus, rather than take funds *away* from local agencies, which Proposition 1A was intended to halt, Assembly Bill 1X 26 provides local agencies with *more* money than they otherwise would have received.

The example Plaintiffs provide in their opening brief to show that a local agency purportedly does not receive its pro rata share of property taxes after Assembly Bill 1X 26 reinforces our interpretation rather than undermines it. They surmise that if a local agency was allocated a 10 percent pro rata share of a $100,000 property tax pool before Assembly Bill 1X 26, it would have received $10,000. If the redevelopment agency in that jurisdiction would have received $50,000 in tax increment prior to dissolution, plaintiffs claim that the local agency should now receive $15,000, or 10 percent of $150,000. This would represent a net gain of $5,000 for the local agency. But, assuming it takes a successor agency $20,000 to satisfy the former redevelopment agency's prior obligations under the waterfall payment provisions, then the local agency would only receive $13,000, or 10 percent of a $130,000 property tax pool after former redevelopment agency indebtedness is satisfied.

Rather than prove that local agencies have somehow been slighted by Assembly Bill 1X 26 in the manner Proposition 1A was intended to guard against, plaintiffs' example demonstrates that the pro rata share of the agency has not changed. Both before

22

and after Assembly Bill 1X 26, the local agency retains its 10 percent pro rata share. The agency simply has more money than it otherwise would have had had the Legislature not passed Assembly Bill 1X 26. While plaintiffs may complain that the *extra* piece of the property tax pie that they received as a result of Assembly Bill 1X 26 is not as big as they would have liked, this hardly means the Legislature violated Proposition 1A when it enacted the statutory scheme to dissolve redevelopment agencies and wind down their affairs.

Plaintiffs' argument implicitly rests on the false premise that because they did not receive a certain "amount" of money after Assembly Bill 1X 26, that their pro rata share therefore changed within the meaning of Proposition 1A. It did not.

The phrase "pro rata" ordinarily means to apportion or divide something according to a certain rate, percentage, or share. (Merriam-Webster's Collegiate Dictionary (11th ed. 2006) p. 997; *Centennial Ins. Co. v. United States Fire Ins. Co.* (2001) 88 Cal.App.4th 105, 114, fn.5.) In the above example, Assembly Bill 1X 26 did not change the agency's 10 percent share. It remained constant both before and after the legislation.

Local agencies have no vested right to a certain *amount* of property taxes. (*Matosantos I, supra,* 53 Cal.4th at p. 245.) Nothing in Proposition 1A changes that. Proposition 1A simply protects an agency's pro rata *share* of property taxes. Because Assembly Bill 1X 26 does not change the pro rata shares of local agency property tax allocations, it does not run afoul of Proposition 1A.

Were we to accept plaintiffs' argument, the Legislature would only be able to dissolve redevelopment agencies and to reallocate their former tax increment after obtaining a two-thirds vote of its membership. This is because as soon as redevelopment agencies were dissolved and their funds disbursed, in plaintiffs' view, pro rata shares of property tax allocations would be affected thereby requiring a two-thirds vote under

23

Proposition 1A. Yet nothing in the plain language of Proposition 1A, or the ballot materials supporting the amendment reveal that the electorate intended such a result.

Constitutional restrictions on the Legislature's power " ' "are to be construed strictly, and are not to be extended to include matters not covered by the language used." [Citations.]' " (*Matosantos I, supra,* 53 Cal.4th at p. 253.) Normally, the Legislature needs only a majority vote to pass legislation. (Cal. Const., art. IV, § 8, subd. (b) ["No bill may be passed unless, by rollcall vote entered in the journal, a majority of the membership of each house concurs"].) We see no reason to artificially impose a heightened voting requirement for dissolving redevelopment agencies, which is clearly within the purview of the Legislature's authority. (*Matosantos I, supra,* 53 Cal.4t at p. 242 [state Constitution vests Legislature with power "to create entities, such as redevelopment agencies, to carry out the state's ends and the corollary power to dissolve those same entities when the Legislature deems it necessary and proper"].)

Plaintiffs' objections to the waterfall payment provisions are likewise without merit. Prior redevelopment plans providing for tax increment funding, many including contracts with work pending at the time of redevelopment agency dissolution and successor agency take over, have outstanding obligations that must be satisfied. (§ 34171, subd. (d)(1) [defining "enforceable obligations"]; § 34177, subd. (i) [successor agency has duty to continue to oversee development of properties until the contracted work has been completed or obligations transferred to other parties]; see also *County of Sonoma v. Cohen*, *supra*, 235 Cal.App.4th at p. 45 [affirming successor agency's ability under ABx1 26 to "reenter" into agreements between former redevelopment agency and itself in its municipal capacity]).) Allocating former tax increment funds to successor agencies under the special trust and directing that those monies be distributed according to the waterfall payment provisions to cover redevelopment agency obligations, including administrative costs, pass-through payments, and enforceable obligations as defined allows this to occur.

As the Supreme Court recognized in *Matosantos I*, the Legislature has "plenary power to set the conditions under which its political subdivisions [like redevelopment agencies] are abolished." (53 Cal.4th at p. 255.) Assembly Bill 1X 26 withdrew redevelopment agency tax increment and reallocated that property tax to the successor agencies charged with winding down their affairs before any remaining funds were disbursed to other taxing entities. In doing so, the Legislature struck a necessary balance. Dissolving a multi-billion dollar program is, to say the least, an incredibly complex undertaking that cannot realistically be accomplished instantaneously. The Supreme Court acknowledged as much in *Matosantos I*. (*Matosantos I* at p. 263 ["As a practical and perhaps constitutional matter, to require an existing entity that has entered into a web of current contractual and other obligations to dissolve instantaneously is not possible; doing so would inevitably raise serious impairment of contract questions"].)

Given the above, it makes sense that the statutory scheme would refer to "former tax increment" of redevelopment agencies in section 34183, subdivision (a)(3) or otherwise refer to redevelopment agencies in the past tense. The same is true for language in section 34189, subdivision (a) that as of the effective date of Assembly Bill 1X 26, all provisions of the Community Redevelopment Law that depend on the allocation of tax increment to redevelopment agencies were inoperative. That redevelopment agencies were no longer allocated tax increment under Assembly Bill 1X 26, does not mean that local agencies' pro rata shares of property taxes were altered within the meaning of Proposition 1A.

Plaintiffs' attempt to parse the language of section 34172, subdivision (d) is unavailing. As we understand their argument, plaintiffs claim that administrative costs for auditor controllers and successor agencies (Priority 1 and 4 payments), pass-through payments (Priority 2 payments) and "enforceable obligations" (Priority 3 payments) are not "obligations" within the meaning of section 34172, subdivision (d).

25

But, administrative costs have historically been recognized as a redevelopment agency obligation. (See *Arcadia Redevelopment Agency v. Ikemoto* (1993) 16 Cal.App.4th 444, 448 [redevelopment agencies subject to administrative costs imposed by auditor-controller]; *Community Redevelopment Agency v. County of Los Angeles* (2001) 89 Cal.App.4th 719, 721 [same].) So, too, have pass-through payments. (*Matosantos I, supra,* 53 Cal.4th at p. 247-248 [noting that redevelopment agencies must make a graduated series of pass-through payments to local government taxing agencies such as cities, counties, and school districts from tax increment on projects adopted or expanded after 1994]; see also §§ 33607.5, 33607.7.) And enforceable obligations as defined by section 34171, subdivision (d)(1), most certainly fall within the ambit of the broader term "obligations" as used in section 34172, subdivision (d).

Plaintiffs' argument that Priority 2 pass-through payments are somehow "newly created" obligations is belied by section 34183 itself, which provides in relevant part: "The amount of the payments made pursuant to this paragraph shall be calculated solely on the basis of passthrough payment obligations, *existing prior to the effective date of this part and continuing as obligations of successor entities*." (§ 34183, subd. (a)(1) [italics added].) The fact that pass-through payments were "existing prior" to Assembly Bill 1X 26 and now "continue" as successor agency obligations necessarily means they are not "new" as plaintiffs argue.

The claim that Priority 2 pass-through payments no longer serve any legitimate constitutional purpose post Assembly Bill 1X 26 likewise misses the mark. That would be true only if Assembly Bill 1X 26 made it as if redevelopment agencies had never existed. But they did exist. And many of the burdens the Legislature sought to alleviate with mandatory pass-through payments will continue into the foreseeable future until all redevelopment agency debts and obligations have been retired even though redevelopment agencies have been dissolved. (See e.g., § 34177, subd. (c) [successor agencies must perform obligations required pursuant to any enforceable obligation], subd.

26

(i) [successor agencies must continue to oversee development of properties until the contracted work has been completed or the contractual obligations of the former redevelopment agency can be transferred to other parties]; § 34180 [oversight board approval required before successor agency action merging project areas].)

Interpreting Assembly Bill 1X 26, as we have, carries out the legislative mandate to wind down redevelopment agency affairs expeditiously, but over time, rather than abruptly as plaintiffs' interpretation requires. (§ 34177, subd. (h) [successor agencies shall "[e]xpeditiously wind down the affairs of the redevelopment agency pursuant to the provisions of this part and in accordance with the direction of the oversight board"].)

Plaintiffs themselves concede interpreting Assembly Bill 1X 26 in the manner they suggest would constitutionally impair numerous third parties' contractual rights. To avoid this, plaintiffs acknowledge that monies from the Redevelopment Property Trust Fund would have to be disbursed to holders of former redevelopment agency "enforceable obligations" before the balance of the trust fund could be disbursed to affected taxing entities. Yet, according to them, disbursing the funds in this manner would still constitute a Proposition 1A violation. Interpreting Assembly Bill 1X 26 in light of the purpose of Proposition 1A as we have avoids unconstitutionally impairing third party contractual rights.

If any interpretation coheres with constitutional mandates, we are duty-bound to interpret Assembly Bill 1X 26 accordingly. (*Davenport, supra,* 41 Cal.3d at p. 264; *United States ex rel Atty. Gen. v. Delaware and Hudson Co., supra,* 213 U.S. at p. 407-408 ["where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter"].) We believe such an interpretation exists; Assembly Bill 1X 26 need not be read in the constitutionally infirm fashion plaintiffs suggest. Our task is not to view the legislation through an unconstitutional lens as plaintiffs urge, but rather through a constitutional one as we have done. (*Kraus, supra,*

27

23 Cal.4th at p. 129 ["We presume that the Legislature understands the constitutional limits on its power and intends that legislation respect those limits"].)

When read in context, Assembly Bill 1X 26 simply dissolved redevelopment agencies, provided for their wind up, and disbursed any remaining funds to local agencies in accordance with their AB 8 allocations.  As a result of Assembly Bill 1X 26, local agencies receive *more* revenue than they otherwise would have been entitled to had redevelopment agencies not been dissolved.  (Cal. Const., art. XVI, § 16, subd. (b).)  Their pro rata shares of property taxes were not changed under the statutory scheme, and, therefore, Assembly Bill 1X 26 does not violate Proposition 1A.

IV

*Article XI, Section 5 - Home Rule Doctrine*

Plaintiffs next argue that Assembly Bill 1X 26 violates Article XI, section 5, the so-called "home-rule" doctrine.  "Under the 'home rule' doctrine, California's Constitution reserves to charter cities the right to adopt and enforce ordinances that conflict with general state laws, provided the subject of the regulation is a 'municipal affair' rather than one of 'statewide concern.' "  (*Barajas v. City of Anaheim* (1993) 15 Cal.App.4th 1808, 1813; Cal. Const., art. XI, § 5, subd. (a).)

Plaintiffs concede, however, that they failed to raise their home rule argument in the trial court.  Because appellants did not argue this theory below, we find the issue forfeited and decline to address it here.  (*Central Pathology Service Medical Clinic, Inc. v. Superior Court* (1992) 3 Cal.4th 181, 185, fn. 2 [appellate courts need not address theories that were not advanced in the trial court]; *Vikco Ins. Services, Inc. v. Ohio Indemnity Co.* (1999) 70 Cal.App.4th 55, 66-67 ["As a general rule, issues or theories not properly raised or presented before the trial court will not be considered on appeal"].)

*Article IV, Section 12(c)(4) – Presentation to the Governor*

We next consider plaintiffs' claim that Assembly Bill 1X 26 is invalid as a pre-budget act appropriation. Assembly Bill 1X 26 was enrolled and presented to the Governor at 4:15 p.m. on June 28, 2011. Senate Bill No. 87 (the Budget Bill) was enrolled and presented to the Governor at 9:45 p.m. that same day. Plaintiffs contend this order of events violates Article IV, section 12(c)(4), even if only by a few hours and even in the absence of any proof that the Governor actually considered Assembly Bill 1X 26 before the Budget Bill. They urge the court to adopt a bright line rule declaring the Legislature's action unconstitutional. We need not decide whether a bright line rule applies, however, because we conclude the circumstances of this case come within one of the constitutional provision's stated exceptions.

Article IV, section 12(c)(4) provides in pertinent part: "Until the budget bill has been enacted, the Legislature shall not send to the Governor for consideration any bill appropriating funds for expenditure during the fiscal year for which the budget bill is to be enacted, except emergency bills recommended by the Governor or appropriations for the salaries and expenses of the Legislature." (Cal. Const., art. IV, § 12, subd. (c)(4).) One purpose of Article IV, section 12(c)(4), as identified by the Supreme Court, is "to enable the Governor to consider the budget bill without a clutter of appropriation measures for the upcoming fiscal year constantly crossing his desk." (*Jarvis v. Cory* (1980) 28 Cal.3d 562, 568 [procedure by which salary appropriation bill was enacted did not violate Article IV, section 12(c)(4) even though bill became law before budget bill was adopted since the order of enactments was due to the governor's veto and not the Legislature's actions].)

The plain language of the constitutional provision demonstrates, however, that under certain circumstances, the Legislature may send an appropriation bill to the

Governor before the budget bill is enacted. (*Jarvis v. Cory*, *supra*, 28 Cal.3d at p. 568.) Here, the State argues the exception for "emergency bills recommended by the Governor" applies. In a passing reference to "limited exceptions not relevant here," plaintiffs summarily dismiss the exception without any further discussion. We agree the State's contention has merit.

Governor Brown declared a fiscal "emergency" in 2011 as a result of a projected $25 billion budgetary shortfall. (*Matosantos I, supra,* 53 Cal.4th at p. 250.) As a partial means of addressing this fiscal emergency, the Governor recommended dissolving redevelopment agencies entirely. (*Matosantos I, supra,* 53 Cal.4th at p. 250; see also Legis. Analyst's Off., The 2011-2012 Budget: Should California End Redevelopment Agencies? (Feb. 9, 2011) p. 1 ["The Governor's 2011-2012 budget includes a plan for dissolving redevelopment agencies and distributing their funds . . . "]; see also Governor's Budget Summary – 2011-2012 (Jan. 10, 2011) p. 171 ["By July 1, existing [redevelopment] agencies would be disestablished and successor local agencies would be required to use the property tax that RDAs would otherwise have received to retire RDA debts and contractual obligations. . . ."].)

That is precisely what Assembly Bill 1X 26 did. It dissolved redevelopment agencies like the Governor recommended, thereby making revenue available to address the emergency fiscal situation confronting the state. (See Assembly Bill 1X 26, § 15 ["This act addresses the fiscal emergency declared and affirmed by the Governor by proclamation on January 20, 2011. . . ."].) Because Assembly Bill 1X 26 contained an appropriation (see Assembly Bill 1X 26, § 11 [appropriating $500,000 to the Department of Finance to cover administrative costs of the act]; *id.* at § 16 ["This act is a bill providing for appropriations related to the Budget Bill. . . ."]), and was a bill enacted to address an impending fiscal emergency as recommended by the Governor, the Legislature did not violate Article IV, section 12(c)(4) by sending Assembly Bill 1X 26

to the Governor.  Under the circumstances, Assembly Bill 1X 26 falls within the ambit of one of the constitutional provision's express exceptions.

VI

*Article IV, Section 9 - Single Subject Rule*

Plaintiffs next argue that Assembly Bill 1X 26 violates the "single subject rule" found in Article IV, section 9.  According to plaintiffs, Assembly Bill 1X 26 contains more than one subject:  (1) an appropriation for $500,000 to carry out the act, and (2) substantive changes to the Community Redevelopment Law.

Article IV, section 9 provides that a "statute shall embrace but one subject, which shall be expressed in its title."  (Cal. Const., art. IV, § 9.)  The constitutional provision contains two independent aspects which serve separate purposes.  (*Harbor v. Deukmejian* (1987) 43 Cal.3d 1078, 1095-1096 (*Deukmejian*).)  A statute must comply with both the requirement that it be confined to one subject and with the command that this one subject be expressed in its title.  (*Id.* at p. 1096.)

"The single subject clause has as its 'primary and universally recognized purpose' the prevention of log-rolling by the Legislature, i.e., combining several proposals in a single bill so that legislators, by combining their votes, obtain a majority for a measure which would not have been approved if divided into separate bills."  (*Deukmejian, supra,* 43 Cal.3d at p. 1096.)  The purpose of the title clause " 'is to prevent legislators and the public from being entrapped by misleading titles to bills whereby legislation relating to one subject might be obtained under the title of another.' "  (*Planned Parenthood Affiliates v. Swoap* (1985) 173 Cal.App.3d 1187, 1196 (*Planned Parenthood*).)

To minimize judicial interference in legislative branch activities, courts must construe the single subject rule liberally.  (*Planned Parenthood, supra,* 173 Cal.App.3d at p. 1196.)  The rule " 'was not designed as a loophole of escape from, or a means for the destruction of, legitimate legislation.' "  (*Id.* at p. 1197.)

31

A "measure complies with the rule if its provisions are either functionally related to one another or are reasonably germane to one another or the objects of the enactment." (*Deukmejian, supra,* 43 Cal.3d at p. 1100; *Planned Parenthood, supra,* 173 Cal.App.3d at pp. 1196-1197 [" 'However numerous the provisions of an act may be, if they can be fairly considered as falling within the subject-matter of legislation, or as proper methods for the attainment of the end sought by the act, there is no conflict with the constitutional provision. . . .' "].) A provision is deemed germane if it is " 'auxiliary to and promotive of the main purpose of the act or has a necessary and natural connection with that purpose. . . .' " (*Planned Parenthood* at p. 1197.)  The title of an act defines the "subject" to which the substance of its provisions must be germane.  (*Planned Parenthood, supra,* 173 Cal.App.3d at p. 1198.)

The Supreme Court's decision in *Deukmejian* addressing the single subject rule is instructive.  The legislation there was enacted 10 days after the budget and was described "as a 'trailer bill' which 'trails' the budget bill and is closely related to it."  (*Deukmejian, supra,* 43 Cal.3d at p. 1097.)  The petitioners suggested "the subject of [the bill] [was] 'fiscal affairs,' as stated in its title, and [ ] its object [was] 'to make statutory adjustments which relate to the ongoing allocation of state funds appropriated annually in the budget bill, within the state programs so funded.' " (*Id.* at p. 1100.)  The bill amended, repealed, or added approximately 150 sections contained in more than 20 codes and legislative acts.  (*Id.* at p. 1097.)

In finding a single subject violation, the court noted that the bill's provisions were not functionally related or germane to one another, and that they appeared only minimally germane to "fiscal affairs," an excessively general topic like "government" or "public welfare." (*Deukmejian, supra,* 43 Cal.3d at p. 1099-1101 [noting that "fiscal affairs" as the subject of the bill and "statutory adjustments" to the budget as its object were matters of excessive generality].)  The bill's many disparate provisions covered such diverse subjects as amending the Business and Professions Code to require that before

transmitting a fiscal impact report to the Legislature, agencies within the Department of Consumer Affairs had to submit it to the director of the department, providing that the Contractors' State License Board may disclose to the public general information regarding complaints against licensees, amending the Military and Veterans Code to provide that a veterans' home may be appointed guardian of the estate of a veteran, and permitting concession contracts for state parks to exceed 20 years. (*Id.* at p. 1100.) And they were only tangentially related to fiscal affairs in the sense that they reduced expenditures or raised revenues. (*Id.* at pp. 1100-1101.)

Here, by contrast, the provisions of Assembly Bill 1X 26 are reasonably germane to one another and to the object or purpose of the act. The title of Assembly Bill 1X 26 states that it is an act to amend certain code sections "relating to redevelopment, and making an appropriation therefor, to take effect immediately, bill related to the budget." (Assembly Bill 1X 26, ch. 5.) Viewed objectively, the purpose of the act was to address the state budget deficit during the declared fiscal crisis in 2011 and balance the budget in part by dissolving redevelopment agencies, winding down their affairs, and reallocating their assets as a means of relieving pressure on the State to backfill educational funding requirement shortfalls. (Assembly Bill 1X 26, ch. 5, § 1; *Matosantos I, supra,* 53 Cal.4th at p. 241 ["Responding to a declared state fiscal emergency, in the summer of 2011 the Legislature enacted two measures intended to stabilize school funding by reducing or eliminating the diversion of property tax revenues from school districts to the state's community redevelopment agencies"].)

Examining Assembly Bill 1X 26's specific provisions reveals a functional relationship or germaneness between its parts. The act amends statutes dealing with redevelopment agency operations and adds new statutory provisions regarding their dissolution and windup. (Assembly Bill 1X 26, ch. 5, §§ 2-9.) The act appropriates funds for the purpose of covering administrative costs associated with the dissolution and windup process. (Assembly Bill 1X 26, ch. 5, § 11.) Dissolving redevelopment agencies

33

freed-up property tax revenues for local agencies to spend on core services, including education.  The provisions of Assembly Bill 1X 26, then, all relate to the subject of redevelopment and its impact on available funding sources to combat the declared 2011 fiscal crisis and balance the budget.  (See *League of Women Voters v. Eu* (1992) 7 Cal.App.4th 649, 666 [distinguishing the subject of "fiscal affairs" under *Deukmejian* from the sufficiently narrow subject of "budget balancing" for purposes of the single subject rule] (*League of Women Voters*).)  Although *League of Women Voters* dealt with the single subject rule applicable to initiatives (Cal. Const., art. II, § 8), "the same principles apply to the single subject rule relating to initiatives as to legislative enactments."  (*League of Women Voters, supra,* 7 Cal.App.4th at p. 665, fn. 7; *Deukmejian, supra,* 43 Cal.3d at p. 1098.)

The provisions, moreover, are also reasonably germane to and promote Assembly Bill 1X 26's main purpose as described above, which we believe is a sufficiently narrow single subject.  When enacted, redevelopment agencies were siphoning off billions in property taxes that otherwise would have gone to local agencies such as schools, counties, special districts, and cities.  (Assembly Bill 1X 26, ch. 5, § 1, subds. (c), (d) & (e).)  Redevelopment agencies were estimated to divert $5 billion in property tax revenue from other taxing agencies in the 2011-2012 fiscal year alone.  (Assembly Bill 1X 26, ch. 5, § 1, subd. (g).)  The State was required to backfill school funds which otherwise would have been available in the absence of redevelopment agencies.  (*Matosantos I, supra,* 53 Cal.4th at pp. 241, 245.)

Dissolving redevelopment agencies and reallocating the property taxes they would have received to first satisfy their obligations and wind down their affairs, with any remaining balances given to local agencies to spend on services such as schools and education, Assembly Bill 1X 26, in a reasonably germane manner, helped alleviate the budget shortfall and balance the budget during a discrete fiscal crisis.  (*League of Women Voters, supra,* 7 Cal.App.4th at pp. 666-667 [budget balancing purpose complies with

34

single subject rule].)  Rather than an amorphous and excessively general purpose such as "fiscal affairs," the purpose of Assembly Bill 1X 26 was much more focused.  In short, Assembly Bill 1X 26 was not a multifaceted measure of undue scope like the bill at issue in *Deukmejian*.

The cases upon which plaintiffs' rely for the proposition that budget bills cannot be utilized to " 'substantively amend[] and change existing statute law' " do not dictate a different result.  *California Lab. Federation v. Occupational Safety & Health Stds. Bd.* (1992) 5 Cal.App.4th 985, 991, *Planned Parenthood*, *supra*, 173 Cal.App.3d at p. 1199, and *Tomra Pacific, Inc. v. Chiang* (2011) 199 Cal.App.4th 463, 484 1199, all involved single subject challenges to the budget act itself.  But Assembly Bill 1X 26 was *not* the Budget Bill.  The fact that Assembly Bill 1X 26 was "related to" the Budget Bill for purposes of Proposition 25 does not automatically convert the bill into the Budget Bill for purposes of the single subject rule.

As the State notes, citing *People v. Wallace* (2004) 120 Cal.App.4th 867, 873, "[t]railer bills are generally separated by subject area such as education, resources, or health, to minimize possible conflicts with single subject limitations that could occur if a general omnibus trailer bill were to be proposed."  In other words, a trailer bill is not part of the budget act; it is separate and remains subject to veto.  (*Professional Engineers, supra,* 50 Cal.4th at p. 1049.)

Given the germaneness of Assembly Bill 1X 26's provisions to its sufficiently narrow subject and purpose, we find no constitutional violation of Article IV, section 9. Because we conclude Assembly Bill 1X 26 satisfies the single subject rule, there is no basis for plaintiffs' claim that the legislation is an example of "logrolling."  (*League of Women Voters, supra,* 7 Cal.App.4th at p. 667 [noting the single subject rule is designed to specifically guard against logrolling; consequently, if proposed legislation conduces to a single subject, logrolling is not an issue].)

35

VII

*Article IV, Section 12 – Majority Approval of a Budget Related Appropriations Bill*

Plaintiffs next argue Assembly Bill 1X 26 does not constitute a bill providing for appropriations "relat[ing] to the budget bill" under amendments to Article IV, section 12, which were added to the Constitution following the voters' approval of Proposition 25. As amended, Article IV, section 12 provides that such bills may be passed by a majority vote of the Legislature. (Cal. Const., art. IV, § 12 (d) & (e).) Finding Assembly Bill 1X 26 falls within the constitutional language added by the amendments, we reject plaintiffs' contention.

Prior to Proposition 25, a two-thirds supermajority of the Legislature was required to pass an annual budget. (Cal. Const., art. IV, former § 12.) That changed in November 2010 when voters approved Proposition 25, known as the "On-Time Budget Act of 2010." Proposition 25 added language to existing subdivision (d) and added new subdivision (e) to section 12 of Article IV.

Article IV, section 12(d) now reads: "No bill except the budget bill may contain more than one item of appropriation, and that for one certain, express purpose. Appropriations from the General Fund of the State, except appropriations for the public schools *and appropriations in the budget bill and in other bills providing for appropriations related to the budget bill*, are void unless passed in each house by rollcall vote entered in the journal, two-thirds of the membership concurring." (Cal. Const., art. IV, § 12, subd. (d) [language added by Proposition 25 amendment in italics].)

Article IV, section 12(e)(1) further explains: "Notwithstanding any other provision of law or of this Constitution, the budget bill and other bills providing for appropriations related to the budget bill may be passed in each house by rollcall vote entered in the journal, a majority of the membership concurring, to take effect immediately upon being signed by the Governor or upon a date specified in the

36

legislation." (Cal. Const., art. IV, § 12, subd. (e)(1).) Subdivision (e)(2), in turn, states: "For purposes of this section, 'other bills providing for appropriations related to the budget bill' shall consist only of bills identified as related to the budget in the budget bill passed by the Legislature." (Cal. Const., art. IV, § 12, subd. (e)(2).)

Because we are tasked with construing the meaning of the Constitution, as amended by the electorate in Proposition 25, our overarching goal is to interpret the words so as to effectuate the electorate's intent. (*People v. Elliott* (2005) 37 Cal.4th 453, 478.) The same general principles regarding statutory construction apply. (*Ibid.*) We begin with the plain meaning of the words chosen, and if the plain meaning is not apparent, we look to extrinsic aids such as the purpose of the amendment, the evil to be remedied, the policy to be achieved, and analyses and arguments contained in official ballot materials. (*Ibid.*)

In this case, Proposition 25 expressly defined the meaning of "other bills providing for appropriations related to the budget bill." (Cal. Const., art. IV, § 12(e)(2).) As defined, the phrase means "only of bills identified as related to the budget in the budget bill passed by the Legislature." Here, Assembly Bill 1X 26 appropriates $500,000 to the Department of Finance from the General Fund for administrative costs associated with the act and declares that it is a budget related bill. (Stats. 2011, 1st Ex. Sess. 2011-2012, ch.5, § 11.) Section 16 of the act provides: "This act is a bill providing for appropriations related to the Budget Bill within the meaning of subdivision (e) of Section 12 of Article IV of the California Constitution, has been identified as related to the budget in the Budget Bill, and shall take effect immediately." (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5 § 16.)

Senate Bill No. 87, the Budget Bill for 2011, specifically identifies Assembly Bill 1X 26 as one of many other bills providing for appropriations related to the Budget Bill. (Sen. Bill No. 87 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 33, § 39.00 ["The Legislature hereby finds and declares that the following bills

37

are other bills providing for appropriations related to the Budget Bill within the meaning of subdivision (e) of Section 12 of Article IV of the California Constitution . . . ABX1 26. . . .”].)

Assembly Bill 1X 26 thus contains an appropriation and is identified as being related to the budget in the Budget Bill. Under the plain language added by Proposition 25, then, Assembly Bill 1X 26 qualifies as an “other bill[] providing for appropriations related to the budget bill” within the meaning of Article IV, section 12(e). (*Matosantos I, supra,* 53 Cal.4th at p. 254 [“ ‘ “we do not look to the Constitution to determine whether the legislature is authorized to do an act, but only to see if it is prohibited” ’ ”]; *County of Riverside v. Superior Court* (2003) 30 Cal.4th 278, 284.)

To avoid this outcome, plaintiffs urge us to read an implied limitation into the meaning of other bills providing for appropriations that are “related to the budget bill.” They argue that an appropriation bill only “*relate[s] to* the budget bill” for purposes of Proposition 25 if its fiscal impact is limited to the current budget year. An appropriation bill would not qualify for majority approval under Article IV, section 12(e), in their view, if it has any collateral effects that extend beyond the current year. To this end, because Assembly Bill 1X 26 has impacts beyond Fiscal Year 2011-2012 since it dissolved redevelopment agencies and effectively dismantled the Community Redevelopment Law it was not “related to” the Budget Bill within the meaning of Article IV, section 12(e)(2).

Plaintiffs cite no authority imposing such an implied limitation under Article IV, section 12(e), however. And our own research has located none.

The interpretation also conflicts with the ordinary meaning of the phrases “relate to” or “related.” In other contexts, such words have been found to be much more expansive than the interpretation plaintiffs urge. (See e.g., *Simon Levi Co. v. Dun & Bradstreet Pension Servs., Inc.* (1997) 55 Cal.App.4th 496, 500-501 (*Simon Levi*) [interpreting phrase “related to” an employee benefit plan for ERISA preemption purposes as a law that has “a connection with or reference to such a plan[;]” “ ‘[u]nder

38

this "broad common-sense meaning," a state law may "relate to" a benefit plan, and thereby be pre-empted, even if the law is not specifically designed to affect such plans, or the effect is only indirect. [Citations.]' "]; see also *Morales v. Trans World Airlines* (1992) 504 U.S. 374, 384, 388-390 ,119 L.Ed.2d 157 [interpreting phrase, "related to" a price, route or service of an air carrier in a preemption clause of Airline Deregulation Act as preempting State enforcement actions for deceptive practices having a connection with or reference to airline "rates, routes, or services"].)

Our own Supreme Court has recognized, " '[r]elated' is a commonly used word with a broad meaning that encompasses a myriad of relationships." (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 868.) "[A] word with a broad meaning or multiple meanings may be used for that very reason--its breadth--to achieve a broad purpose." (*Ibid.*) Interpreting Article IV, section 12(e) in the manner plaintiffs suggest ignores the breadth of the phrase "relate to."

It is also hard to imagine a bill, the effects of which are confined to a single year. With finite funds, choosing to allocate money to certain programs in one fiscal year necessarily means withdrawing or withholding funds from other areas. The effects of such a choice arguably reverberate for years. This does not mean, however, that a bill making such an election was not budget related in the year proposed. To decide otherwise would, as a practical matter, nullify as a constitutional matter most, if not all, such bills. That cannot be what the constitution intends.

Even the alternative method for addressing the fiscal crisis proffered by plaintiffs-- freezing redevelopment agency operations for Fiscal Year 2011-2012 only--has effects beyond that fiscal year. Had their operations been frozen during that period, potential redevelopment projects might have been abandoned if, for example, in the meantime prices rose making the project cost prohibitive when they were permitted to resume operations. Those effects would have been felt well after Fiscal Year 2011-2012 had passed.

39

Plaintiffs' interpretation, moreover, essentially renders the exception for "appropriations [bills] related to the budget bill" meaningless. Because almost any bill could be characterized as having collateral impacts beyond a specific fiscal year, no trailer bill could ever be approved by a majority vote under Article IV, sections 12(d) and 12(e). Such an interpretation should be avoided. (*Dyna-Med, supra,* 43 Cal.3d at pp. 1386-1387 [when construing a statute, courts must give meaning and significance to each word, phrase, and sentence, and must avoid an interpretation that makes any part of a statute meaningless].)

At a minimum, plaintiffs' preferred definition places an intolerable burden on the legislative process. If, as plaintiffs suggest, an appropriations bill only qualifies as "related to the budget" if it lacks any effects beyond that budget year, the result would be a continual conflict over whether the proper scope of an appropriations bill was exceeded. If any potential effects could be identified, the appropriations bill would not qualify, even if it clearly had a demonstrated connection with the budget bill in the given year.

And nothing in the official ballot materials leads us to believe that voters intended the phrase "related to" to be as restrictive as plaintiffs contend. Instead, the voter materials explained that certain budget actions "require changing state law," and that such "changes often are included in 'trailer bills' that accompany passage of the budget each year." (Ballot Pamp., Gen. Elec. (Nov. 2, 2010), official analysis of Proposition 25 by the Legislative Analyst at p. 52.) The materials clearly point out that the lower vote requirement also would apply to "trailer bills that appropriate funds and are identified by the Legislature 'as related to the budget in the budget bill.' " (*Id.* at p. 53.)

Noticeably absent from the voter pamphlet material is any mention of an unduly restrictive definition of "relating to the budget" like the one plaintiffs proffer here. And given that voters were told various budget related actions required changing state law, which were ordinarily included in trailer bills, it is unsurprising that Assembly Bill 1X 26

40

was passed as a budget related trailer bill and made changes to the Community Redevelopment Law.

Plaintiffs' reliance on *Deukmejian* as mandating that we construe Proposition 25's phrase "related to the budget bill" so that an appropriations bill only qualifies as such if its impact is limited to that fiscal year is also misplaced. (See *Deukmejian, supra,* 43 Cal.3d 1078.) " 'It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered.' " (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 680.) *Deukmejian* did not involve Proposition 25, and the court had no occasion to decide the meaning of the phrase "related to the budget bill" as used in Article IV, section 12(e). Instead, as discussed above, the court was faced with whether a bill enacting, amending, and repealing 150 different sections contained in more than 20 codes and legislative acts violated the single subject rule in Article IV, section 9. (*Deukmejian, supra,* 43 Cal.3d at pp. 1083, 1097.)

The court found that the bill's disparate provisions were not functionally related or germane to one another, and that they were only minimally germane to the excessively general subject of "fiscal affairs." (*Deukmejian, supra,* 43 Cal.3d at pp. 1100-1101.) Nothing in that decision, however, compels us here to apply an unduly circumscribed definition of "related to the budget bill" for purposes of Proposition 25.

Finally, plaintiffs' contention that the Legislature could have addressed the declared fiscal crisis in a different manner is true but irrelevant. As alluded to above, they suggest the Legislature could have placed a one-year moratorium on redevelopment agencies incurring any new debt and amended Health and Safety Code section 33670, subdivision (b), to limit their ability to collect tax increment for that year.

But simply because the Legislature *could* have addressed the fiscal crisis in a different manner does not mean it was *constitutionally mandated* to do so, or that the Legislature's chosen method--dissolving redevelopment agencies--did not "relate to" the

41

Budget Bill.  Plaintiffs themselves acknowledged during the preliminary injunction hearing that dissolving redevelopment agencies under Assembly Bill 1X 26 was anticipated to boost state revenues for Fiscal Year 2011-2012 by nearly $1.1 billion.

We reject plaintiffs' attempt to impose such an overly constricted definition of "related to" in the context of Proposition 25, at least under the circumstances of this case. That the phrase might potentially be subject to different interpretations elsewhere in the law does not change our decision under the facts presented here.  (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53 [recognizing that the judiciary may not undertake to evaluate the wisdom of the policies embodied in legislation]; *California Assn. of Retail Tobacconists v. State of California* (2003) 109 Cal.App.4th 792, 807 [judiciary does not consider or weigh the economic or social wisdom of an initiative measure].)

Finally, we disregard plaintiffs' citation to *Howard Jarvis Taxpayers Assn. v. Bowen*, case No. C071506, regarding the constitutionality of a budget trailer bill under Article IV, section 12(e).  That case has since been ordered depublished.  (See *Howard Jarvis Taxpayers Assn. v. Bowen* (2013) 212 Cal.App.4th 1298, ordered depublished May 22, 2013 (*Bowen*).)  Even if it were still good law, however, we note that the decision expressly declined to address the meaning and extent of the phrase "related to the budget."  (*Bowen* at former p. 1305 [stating that court need not decide whether a bill amending the Elections Code to reorder ballots was "related to the budget"].)

VIII

*Article IV, Sections 3(b) and 10(f) – The Governor's Emergency Proclamation*

Plaintiffs last contend in passing that Assembly Bill 1X 26 is unconstitutional under Article IV, section 3(b) and Article IV, section 10(f) because it exceeds the scope of the Governor's emergency proclamation.

42

Article IV, section 3(b) provides: "On extraordinary occasions the Governor by proclamation may cause the Legislature to assemble in special session. When so assembled it has power to legislate only on subjects specified in the proclamation but may provide for expenses and other matters incidental to the session."

First, Governor Brown did not invoke Article IV, section 3(b) when issuing his emergency proclamation in January 2011. The Governor, instead, relied on Article IV, section (10)(f). ["Now, Therefore, I, Edmund G. Brown Jr., Governor of the State of California, in accordance with Section 10(f) of Article IV of the Constitution of the State of California, HEREBY DETERMINE. . . ."])

That constitutional provision provides in part: "If, following the enactment of the budget bill for the 2004-05 fiscal year or any subsequent fiscal year, the Governor determines that, for that fiscal year, General Fund revenues will decline substantially below the estimate of General Fund revenues upon which the budget bill for that fiscal year, as enacted was based, or General Fund expenditures will increase substantially above that estimate of General Fund revenues, or both, the Governor may issue a proclamation declaring a fiscal emergency and shall thereupon cause the Legislature to assemble in special session for this purpose." (Cal. Const., art. IV, § 10, subd. (f)(1).) Whether Assembly Bill 1X 26 is proper under Article IV, section 3(b), then, is irrelevant.

Plaintiffs' second argument--that Assembly Bill 1X 26 exceeds the scope of the Governor's emergency proclamation because it had effects beyond Fiscal Year 2011-2012--is likewise without merit. Rather than citing any supporting authority, plaintiffs instead recycle their argument that the Legislature could have addressed the declared fiscal crisis in a different manner. As noted above, that the Legislature could have proceeded differently does not mean it was required to do so.

Legislators, as the people's duly elected representatives, can choose to address complex problems in more than one way. (See e.g. *People v. McKee* (2010) 47 Cal.4th 1172, 1221 [J. Chin, concurring and dissenting opn., [recognizing the Legislature's

43

ability to address societal problems in various ways].)  Indeed, the very breadth and complexity of the projected $25 billion budget shortfall for Fiscal Year 2011-2012 suggests that there was more than one constitutionally permissible method of solving the fiscal crisis.

Assembly Bill 1X 26 helped alleviate the declared fiscal crisis by boosting state revenues for Fiscal Year 2011-2012 and by helping to balance the budget.  That is all Article IV, section 10(f) requires.  (Cal. Const., art. IV, § 10, subd. (f)(1) ["the Governor may issue a proclamation declaring a fiscal emergency and shall thereupon cause the Legislature to assemble in special session for this purpose"].)

DISPOSITION

The trial court's order denying the motion for a preliminary injunction is affirmed. The case is remanded for further proceedings consistent with the foregoing opinion. Respondents are awarded their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


       HULL       , J.


We concur:


    BLEASE    , Acting P. J.


    MURRAY    , J.

44