Filed 8/7/17

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF CULVER CITY et al., | C077799 |
| Plaintiffs and Respondents, | (Super. Ct. No. 34-2013-80001719-CU-WM-GDS) |
| v. | |
| MICHAEL COHEN, as Director, etc., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne W. L. Chang, Judge. Affirmed.

Kamala D. Harris and Xavier Becerra, Attorneys General, Douglas J. Woods, Chief Assistant Attorney General, Marc A. LeForestier and Sylvia A. Cates, Deputy Attorneys General, for Defendant and Appellant.

Kane, Ballmer & Berkman, Murray O. Kane, Joan S. Smyth, Edward B. Kang for Plaintiffs and Respondents.

1

During the freeze period under the legislation that eventually dissolved community redevelopment agencies in California (the Dissolution Law), Culver City's former redevelopment agency made an unauthorized transfer to Culver City (the City) of about $12.5 million. The Department of Finance (DOF) discovered the unauthorized transfer after the former redevelopment agency was dissolved and the City took over as the successor agency. Based on that discovery, DOF authorized the county auditor-controller to reduce by about $12.5 million the tax increment revenue made available to the successor agency to pay the successor agency's enforceable obligations.[1]

In a prior action, now final, the Sacramento Superior Court held that the reduction to the amount made available to the successor agency for payment of its enforceable obligations was proper because the former redevelopment agency's transfer of $12.5 million to the City was unauthorized under the Dissolution Law. (*City of Culver City v. Matosantos* (Super. Ct. Sacramento County, 2013, No. 34-2013-80001446-CU-WM-GDS) (*Culver City I*).) In other words, the former redevelopment agency should have retained the $12.5 million to pay its bills rather than transferring it to the City. DOF did not seek an order requiring the City to repay the $12.5 million. And neither party appealed the superior court's judgment.

Since judgment was entered in *Culver City I*, the City has not repaid the $12.5 million to the successor agency, and DOF has continued to authorize successive reductions to the allotment of tax increment revenue to the successor agency to pay its enforceable obligations. DOF asserts that those funds held by the City are available to

---

[1]     The actual amount of the reduction fluctuated because of other factors not relevant to this appeal. We therefore refer throughout this opinion to the amount of $12.5 million, with the understanding that this approximation may not represent the precise amount at issue but that it does not affect the reasoning or result in this appeal.

the successor agency for payment of its enforceable obligations, but the City maintains that it has no duty to pay the money back.

In this action, the City, both in its municipal capacity and as the successor agency of the former redevelopment agency, seeks mandamus relief to stop DOF's successive $12.5 million reductions of tax increment revenue to pay the successor agency's enforceable obligations. On the other hand, DOF seeks an order reversing the former redevelopment agency's transfer of $12.5 million to the City and requiring the City to return the money.

The superior court in this action held that DOF's successive reductions to the tax increment revenue made available to the successor agency for payment of its enforceable obligations (which reductions are essentially a self-help remedy invoked by DOF to prompt the City to pay back the $12.5 million) are not authorized by the Dissolution Law. Based on this holding, the superior court granted the City's petition for writ of mandate. While recognizing *Culver City I*'s holding that the former redevelopment agency's transfer to the City was unauthorized, the superior court denied DOF's petition for an equitable writ of mandate requiring the return of the money because there is a statutory remedy for this situation—that is, the State Controller has the duty to conduct a review of all asset transfers between a former redevelopment agency and its sponsoring agency (here, the City) during the freeze period and to order return of any money transferred to the sponsoring agency if the transfer was unauthorized by the Dissolution Law.

Since the superior court entered judgment in this action, the State Controller has conducted its review and has ordered the City to return the $12.5 million to the successor agency.

DOF appeals, asserting that the superior court erred by: (1) denying DOF's petition for writ of mandate directing the City to return the money and (2) finding that successive reductions to the tax increment revenue provided to the successor agency for the same $12.5 million held by the City is not authorized by the Dissolution Law.

We affirm. First, the remedy under the Dissolution Law to force reversal of an unauthorized transfer from a former redevelopment agency to its sponsoring agency, at this point in the dissolution process, is through the State Controller's asset transfer review process, not through a mandamus action by DOF. Therefore, the superior court properly denied mandamus relief on DOF's petition. And second, nothing in the Dissolution Law permits DOF to make successive reductions to the tax increment revenue provided to pay the successor agency's enforceable obligations under these circumstances. Therefore, granting mandamus relief to the City was also proper.

BACKGROUND

In June 2011, the Dissolution Law was enacted. It froze the activities of redevelopment agencies, prohibiting them from taking out or accepting loans from other public agencies for any purpose. (Health & Saf. Code, § 34162, subd. (a)(4); see *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231; *City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020; *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488 for summaries of the Dissolution Law.)

In October 2011, four months after the freeze took effect, the City loaned about $12.5 million (the City Loan) to its former redevelopment agency, the Culver City Redevelopment Agency. The City and the successor agency alleged in *Culver City I*, but did not substantiate, that the former redevelopment agency needed the money to make debt service payments on bonds.

Before the former redevelopment agency was dissolved by operation of law on February 1, 2012, it transferred to the City $12.5 million. The former redevelopment agency did not disclose the City Loan as an enforceable obligation in its mandated reporting. (See Health & Saf. Code, §§ 34167, subd. (h); 34169, subd. (g) [requiring former redevelopment agency to list enforceable obligations and refrain from making unlisted payments].)

4

When the former redevelopment agency dissolved, the City took over as the successor agency to wind down the affairs of the former redevelopment agency. In its first recognized obligation payment schedule (ROPS I) (Health & Saf. Code, § 34171, subd. (h)), the successor agency (a separate legal entity from the City in its municipal capacity) did not list the City Loan as an enforceable obligation.

In a subsequent ROPS submission (ROPS III), the successor agency disclosed for the first time that the former redevelopment agency had transferred $12.5 million to the City to, in the successor agency's words, "repay loan given by Culver City to [the former redevelopment agency] to pay Nov 11 Debt Svc payment." The successor agency requested reimbursement of the $12.5 million from the redevelopment property tax trust fund (RPTTF), which is the fund into which tax increment revenue formerly given to redevelopment agencies is deposited under the Dissolution Law. (See Health & Saf. Code, §§ 34170.5, subd. (b), 34183.) The county auditor-controller refused to pay the $12.5 million from the RPTTF, finding that the City Loan was not an enforceable obligation under the Dissolution Law, and DOF reviewed and approved the county auditor-controller's determination. Thus, the successor agency's request for RPTTF funds was reduced by $12.5 million. (Health & Saf. Code, § 34186, subd. (a)(1).)

In *Culver City I*, the City, both in its municipal capacity and as successor agency, filed a petition for writ of mandate and complaint for declaratory relief against the county auditor-controller and DOF. It sought relief directing the auditor-controller and DOF to reimburse the successor agency from the RPTTF for the City Loan repayment. The superior court in that case noted that it was "undisputed that after [the Dissolution Law] was passed, the City Loan and former [redevelopment agency's] repayment thereof was unauthorized. (*See*, Health & Saf. Code, §§ 34162, 34163.)" The court therefore denied the relief sought by the City and the successor agency because the City Loan was not an enforceable obligation payable out of funds from the RPTTF. The court further held that whether the former redevelopment agency used the money obtained in the City Loan to

5

pay debt service on bonds was not relevant; the City Loan was a separate obligation from any bond indebtedness.

Neither the City nor DOF appealed the judgment in *Culver City I*.

Since the judgment in *Culver City I*, the City has not returned to the successor agency the $12.5 million transferred from the former redevelopment agency as repayment of the City Loan. Therefore, in its ROPS reports prepared after judgment was entered in *Culver City I*, the successor agency has not listed that money as being available to make payments on its enforceable obligations.

Also since the judgment in *Culver City I*, DOF has made a reduction of about $12.5 million in the amount of RPTTF funds requested by the successor agency in each of two different ROPS cycles (ROPS 13-14B & ROPS 14-15A) because neither of those ROPS reports listed the $12.5 million as available to the successor agency for payment of its enforceable obligations.

The City, both in its municipal capacity and as successor agency, filed a petition for writ of mandate and complaint for declaratory relief against the county auditor-controller and DOF seeking an order for the county auditor-controller to distribute the $12.5 million from the RPTTF to the successor agency for payment of its enforceable obligations as reflected in ROPS 13-14B. Later, the City filed a supplemental petition and complaint with respect to ROPS 14-15A. (The City also sought a temporary restraining order and a preliminary injunction, but, since final judgment has been entered, we need not give the details of the preliminary relief sought.)

DOF filed a cross-petition seeking mandate against the City and the successor agency. In that petition, DOF sought an order (1) "reversing" the $12.5 million transfer from the former redevelopment agency to the City on the City Loan and (2) directing the City to pay interest to the successor agency on the money illegally transferred. DOF also sought (1) an order directing the successor agency to take action to recover from the City the money illegally transferred and (2) a declaration that the successor agency must use

6

the $12.5 million from the City either to pay its enforceable obligations or to pass it on to taxing entities.

The trial court granted the City's petition, finding that the reductions in ROPS 13-14B and ROPS 14-15A for the $12.5 million retained by the City were unjustified because the auditor-controller and DOF already made the adjustment in the ROPS III period. According to the court, DOF could not deem the illegally transferred money "available" to the successor agency to pay enforceable obligations and, based on that determination, reduce RPTTF distributions in successive periods. (Health & Saf. Code, § 34177, subd. (*l*)(1)(E).) The court denied the City's requests for declaratory and injunctive relief as moot.

The superior court denied DOF's cross-petition against the City and the successor agency because DOF has a plain, speedy, and adequate remedy at law. Specifically, the court noted that the Dissolution Law charges the State Controller to review asset transfers made between the former redevelopment agency and the City during the freeze period. The Dissolution Law provides: "If such an asset transfer did occur during that period and the government agency that received the assets is not contractually committed to a third party for the expenditure or encumbrance of those assets, . . . the Controller shall order the available assets to be returned to . . . the successor agency . . . ." (Health & Saf. Code, § 34167.5.) The court concluded that DOF must wait for the State Controller to complete her review.

After the superior court entered judgment and while this appeal was pending, the State Controller, on October 16, 2015, issued her review of asset transfers between the City and its former redevelopment agency. We granted the City's request for judicial notice of that official report. In the asset review, the State Controller wrote the following about the City Loan:

"On December 29, 2011, the [former redevelopment agency] transferred $12,500,000 to the City as repayment of a short-term loan. On December 31, 2011, the

7

[former redevelopment agency] transferred $7,917 to the City for an interest payment on the short-term loan. According to the City Council meeting minutes and an agenda item report on October 24, 2011, the principal loan amount of $12,500,000 was to be used to make [former redevelopment agency] bond payments in October and November 2011. The loan was to be repaid by December 29, 2011, and had an interest rate equal to the Local Agency Investment Fund. Because the short-term loan and the subsequent repayment occurred within the same fiscal period, the net effect to the [former redevelopment agency's] funds is the loan interest payment of $7,917." The State Controller did not mention the judgment in *Culver City I* in this asset review.

We requested supplemental briefing from the parties on the effect of the State Controller's asset transfer review in connection with the judgment in *Culver City I*. After we made the request, the State Controller issued an addendum to the asset review. We took judicial notice of the addendum. In the addendum, the State Controller wrote that she "initially regarded the repayment [of the $12.5 million loan] as a negating transaction to the loan itself, netting an unallowable asset transfer of $7,917, which represents the interest payment on the loan. However, according to the Sacramento Superior Court's decision in [*Culver City I*], the Superior Court found that the City [L]oan and the former [redevelopment agency] repayment thereof was unauthorized, in violation of Health and Safety Code sections 34126 and 34163 and ruled in favor of [DOF]. The matter was not appealed and is considered final. Therefore, consistent with the Court's determination, the loan principal and the interest should be turned over to the Successor Agency for disposition in accordance with [Health and Safety] Code section 34177[, subdivision] (d)."

8

DISCUSSION

I

*The Transfer of $12.5 Million from the Former Redevelopment*

*Agency to the City was not Authorized by the Dissolution Law*

Before we turn to the superior court's rulings that (1) DOF is not entitled to a writ of mandate and (2) successive reductions of funds available to the successor agency are not authorized, we consider the foundational question, disputed by the parties, of whether the former redevelopment agency's transfer of $12.5 million to the City before the agency was dissolved was authorized by the Dissolution Law. We conclude: (1) the question was answered in *Culver City I* and has collateral estoppel effect in this case, and (2) in any event, the transfer was unauthorized under the Dissolution Law.

A. Culver City I *is Entitled to Collateral Estoppel Effect*

Under the Dissolution Law, tax increment revenue, formerly allocated to redevelopment agencies, is paid into the RPTTF. (Health & Saf. Code, § 34183.) The RPTTF is administered by the county auditor-controller, who, generally, distributes money from the RPTTF to pay the enforceable obligations of the successor agency and distributes the rest of the money to taxing entities—that is, to those entities that would have received the tax revenue had it not been tax increment revenue. (*City of Cerritos v. State of California, supra,* 239 Cal.App.4th at p. 1037.) The successor agency requests money from the RPTTF by submitting a ROPS, which under the law relevant to this appeal, is a semi-annual list of the successor agency's enforceable obligations.

The *Culver City I* court concluded that the transfer of $12.5 million from the former redevelopment agency to the City during the freeze period before the former redevelopment agency was dissolved was unauthorized under the Dissolution Law. Based on that holding, the *Culver City I* court further held that the county auditor-controller's reduction of funds available to the successor agency from the RPTTF, with DOF approval, was proper under the Dissolution Law for the ROPS III period. Because

9

neither party appealed the *Culver City I* judgment, that action is final and those holdings have collateral estoppel effect.

When the following conditions are met, we apply collateral estoppel: " 'First, the issue sought to be precluded from relitigation must be *identical* to that decided in a former proceeding. Second, this issue must have been *actually litigated* in the former proceeding. Third, it must have been *necessarily decided* in the former proceeding. Fourth, the decision in the former proceeding must be *final and on the merits.*' " (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 849, italics added.)

Each of these elements of collateral estoppel is present here, with respect to the *Culver City I* judgment. The issue is identical—whether the transfer of funds from the former redevelopment agency to the City was authorized under the Dissolution Law. The issue was actually litigated, as we discuss in the next paragraph. The issue was necessarily decided on the merits in the former proceeding, resulting in a judgment in favor of DOF. And *Culver City I* is final.

In *Culver City I*, the City, acting both in its municipal capacity and as successor agency, argued that the transfer of funds from the former redevelopment agency to the City as repayment for the $12.5 million loan was authorized under the Dissolution Law. The City argued that there was no illegal transfer of funds but, instead, a legal transfer of funds from the City to the former redevelopment agency to pay enforceable obligations and then back to the City to repay the loan. In its decision in *Culver City I*, the superior court wrote that it was "undisputed" that the repayment of the City Loan was unauthorized under the Dissolution Law. While we do not know why the superior court said the matter was undisputed, the record of that action, parts of which were included in the record of this action, establishes that the City disputed whether the transfer of funds to the City was unauthorized. In the end, the unauthorized nature of the transfer was a necessary foundation for the *Culver City I* holding that distribution of RPTTF funds to

10

the successor agency for payment of its enforceable obligations was properly reduced by $12.5 million.

In *Culver City I*, the unauthorized status of the City Loan repayment was central to the superior court's conclusion that the amount of the repayment was properly deducted from the RPTTF money available to the successor agency to pay its enforceable obligations. Also, the court held that the former redevelopment agency's purported use of the City Loan funds—that is, to pay on bond debt—did not authorize the City Loan and the former redevelopment agency's transfer of funds to the City. The transfer to the City was not, itself, a bond payment, even if the money the former redevelopment agency obtained from the City was used to make payments on bonds.

The *Culver City I* court observed:

"[T]he RPTTF represents a finite source of funds. Accordingly, every decision regarding payment of enforceable obligations effectively shifts the finite amount of funds from one entity to another. Thus, by creating a new enforceable obligation [the City Loan] and describing it as bond debt service . . . rather than disclosing it to DOF, the Successor Agency, in essence, redirected funds from taxing entities when it received the RPTTF monies for the ROPS I submission."

We conclude that *Culver City I* decided: (1) the former redevelopment agency's transfer of funds to the City during the freeze period was unauthorized and (2) the former redevelopment agency's transfer to the City cannot be treated as payment on bond debt. Those holdings are entitled to collateral estoppel, and the City cannot relitigate them. However, having determined that *Culver City I* collaterally estops the City's argument as to the issues decided in that case, we note that *Culver City I* does not provide collateral estoppel for whether the City must reverse the former redevelopment agency's repayment of the City Loan—that is, pay the money back. That issue was neither considered nor decided by the *Culver City I* court. Therefore, the City is not collaterally estopped from

11

litigating that issue, even though *Culver City I* determined that the repayment was unauthorized under the Dissolution Law.

B.     *The Dissolution Law did not Authorize the Transfer*

In any event, the City's efforts to defend the former redevelopment agency's transfer of $12.5 million to the City as being authorized by the Dissolution Law are futile. According to the Legislature, a transfer of assets from a former redevelopment agency to its sponsoring agency during the freeze period "is deemed not to be in furtherance of the Community Redevelopment Law and is . . . unauthorized." (Health & Saf. Code, § 34167.5.)  No statute in effect at the time of the transfer at issue here allowed the former redevelopment agency to transfer the funds to the City.

Despite this absence of authorizing legislation, the City contends that no adverse consequences should flow to the City because:  (1) the transfer to the City was merely an unwinding of the transfer to the former redevelopment agency and (2) all parties in the process have been made whole.  Neither argument has merit.

First, while there is some logical merit to the argument that the transfer to the City was merely an unwinding of the transfer to the former redevelopment agency, the fact remains that the Dissolution Law did not authorize the transfer back to the City.  The City has provided no authority in the Dissolution Law for the payment to the City.

The Legislature enacted the freeze provisions of the Dissolution Law "to preserve, to the maximum extent possible, the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services" and to ensure that redevelopment agencies would take no action that would further deplete the corpus of the agencies' funds regardless of their original source.  (Stats. 2011-2012, 1st Ex. Sess. 2011-2012, ch. 5, § 6 (Assem. Bill No. X1 26); Health & Saf. Code, § 34167, subd. (a).)  The Legislature directed that these provisions "shall be construed as broadly as possible to

12

support this intent and to restrict the expenditure of funds to the fullest extent possible." (*Ibid.*)

The freeze provisions include a "claw back" provision. (8 Miller & Starr, Cal. Real Estate (4th ed. 2016) § 30:1, pp. 30-9 to 30-10.) Under that provision, a redevelopment agency's transfer of assets is unauthorized after January 1, 2011. The State Controller must determine whether such asset transfers occurred between a redevelopment agency and its sponsoring agency. (Stats. 2011-2012, 1st Ex. Sess. 2011-2012, ch. 5, § 6 (Assem. Bill No. X1 26); Health & Saf. Code, §§ 34163, subd. (d)(1), 34167.5 [also requiring review of asset transfers involving other public agency and redevelopment agency].) In general, if a relevant asset transfer occurred and the government entity that received the asset was not contractually committed to a third party for the expenditure or encumbrance of that asset, the Controller must order the return of the asset. (Stats. 2011-2012, 1st Ex. Sess. 2011-2012, ch. 5, § 6 (Assem. Bill No. X1 26).)

Therefore, the argument that the transfer to the City was merely an unwinding of the transfer to the former redevelopment agency has no merit under the Dissolution Law. The transfer to the City, which was the former redevelopment agency's sponsoring agency, was unauthorized and subject to the claw back provision.

And second, the transfer from the redevelopment agency to the City, along with DOF reduction of RPTTF funds to the successor agency, as approved by *Culver City I*, did not make all parties whole under the Dissolution Law. The City contends that the remedy in *Culver City I* rectified the matter for all parties—made all parties whole. That is not true. While the *Culver City I* court approved DOF's $12.5 million reduction of RPTTF funds distributed to the successor agency, that case did not consider whether the City must return the $12.5 million to the successor agency. As the *Culver City I* court said, there is a finite amount of funds. The City still has the $12.5 million to which it is not legally entitled. Therefore, some fund is short $12.5 million. However, as we hold

13

later, an order to reverse the City Loan is the province of the State Controller, who is not a party to this action.

## II

*The Remedy for an Unauthorized Transfer to the City Lies in the State Controller's Audit Transfer Review Process, Not in Mandamus Relief for DOF*

DOF contends that the City has created an imbalance in the ROPS system to the detriment of taxing entities that would receive tax increment revenue from the RPTTF if it was not needed to pay the successor agency's enforceable obligations. In other words, money that should be flowing to the taxing entities is lying in the City's coffers. The City argues that it has no duty to pay back the money and, in the alternative, the proper remedy is through the State Controller's asset transfer review process. We conclude that, although the former redevelopment agency's repayment of the City Loan to the City was unauthorized, as found in *Culver City I*, the proper Dissolution Law remedy is to obtain the return of the money through the State Controller's asset transfer review process, not through mandamus relief in favor of DOF.

A. *The City's Failure to Return the $12.5 Million to the Successor Agency Has Caused an Imbalance in the Dissolution Law's System for Distributing Tax Revenue*

DOF argues that, because the City has not returned the $12.5 million to the successor agency, an imbalance exists in the statutory system of paying the successor agency's enforceable obligations and passing the remaining funds on to the taxing entities. The City responds that all entities have been made whole; therefore, no remedy beyond the judgment in *Culver City I* is necessary. We agree with DOF that the City's failure to return the $12.5 million has created an imbalance in the intended effects of the Dissolution Law.

DOF makes the following argument concerning what it refers to as a "structural imbalance" in the ROPS system created by the City's failure to return the $12.5 million:

"For the ROPS III RPTTF distribution that was the subject of *Culver City I*, the Auditor-Controller distributed approximately $3.1 million to the Successor Agency on January 3, 2013, after adjusting the amount by approximately $11.5 million to account for the $12.5 million improper transfer to the City (the adjustment was not for the entire $12.5 million due to other adjustments unrelated to the loan payment). [Record citations.] The adjustment did not reduce the total amount of enforceable obligations required to be paid [by the Successor Agency] during ROPS III by a like amount. It only meant that the RPTTF would not be the funding source for payment on the enforceable obligations for the amount of the adjustment.

"However, after the Auditor-Controller made the adjustment, instead of recovering the $12.5 million of unlawfully-transferred funds from the City to use those funds to make its required ROPS III payments, the Successor Agency paid only a small portion of the enforceable obligations on its ROPS III and simply pushed those obligations into the following ROPS cycles. [Record citations.] Specifically, the Successor Agency made only $3.1 million in actual payments on the estimated $14.6 million in payments on recognized obligations it was supposed to make during the ROPS III cycle. [Record citations.] Then, it placed the unpaid enforceable obligations on future ROPS, the ROPS 13-14B and 14-15A at issue in this case. [Record citations.]

"For each ROPS cycle, new property tax revenue is generated and is completely used in that ROPS cycle. (See [record citation]; [Health & Saf. Code,] § 34177, subd. (*l*)(1)(E).) In contrast, unpaid enforceable obligations do carry over to the next cycle. [Record citation.] Here, the Successor Agency sought RPTTF monies again to pay obligations that should have been paid during ROPS III with the $12.5 million that the City was holding. [Record citations.] But the new RPTTF would not be needed if the City had returned the funds to the Successor Agency and they were used as intended—to pay down approved enforceable obligations. This is why there is currently a structural

15

imbalance in the ROPS system for Culver City. [Record citations.] There is $12.5 million of unpaid obligations that should have been paid in previous ROPS cycles."

The City responds to this argument, not by denying that the successor agency carries forward to each successive ROPS cycle the enforceable obligations it is unable to pay with the RPTTF distribution from the prior ROPS cycle, but instead by arguing the judgment in *Culver City I* made all parties whole. In supplemental briefing, the City argued:

"The City and the Successor Agency accepted the [*Culver City I*] ruling without appeal because the end result was a wash for the public entities involved: (l) the City was reimbursed for the temporary loan used to make required bond payments; (2) the Successor Agency got credit for the bond payment in that there was no default in the bonds it has inherited from the [former redevelopment agency]; and (3) the taxing entities received the RPTTF they allegedly would have received but for the bond payment reimbursement."

This argument does not hold water because the City was not entitled to "reimbursement" for the "temporary loan" even if the successor agency used the "loan" to make bond payments. As we held above, the City was not entitled under the Dissolution Law to "reimbursement." Once the money passed into the former redevelopment agency's coffers, that money was subject to the Dissolution Law. And nothing in the Dissolution Law allowed the successor agency to return the money to the City. The City cites no authority contradicting that conclusion.

Because (1) tax increment revenue that flows into the RPTTF is finite, as the superior court noted in *Culver City I*, and (2) the City is retaining funds that should have been used by the successor agency to either pay its enforceable obligations or pass on to the taxing entities, there is an imbalance in the statutory system of paying the successor agency's enforceable obligations and passing money on to taxing entities.

16

B.    *Mandamus Relief is not Available to DOF because the State has a Legal Remedy*

But the existence of this structural imbalance does not necessarily entitle DOF to mandamus or other equitable relief against the City.  Equitable remedies such as a writ of mandate can be barred by the presence of a legal remedy if that remedy is plain, speedy and adequate.  (See Code Civ. Proc., § 1086; see *Wenzler v. Municipal Court* (1965) 235 Cal.App.2d 128, 133-134 [mandamus relief not available to compel county to refund fine paid for violation of unconstitutional ordinance because the plaintiff made no showing that civil action for refund was inadequate].)

Health and Safety Code section 34167.5 requires the State Controller to review asset transfers from former redevelopment agencies to their sponsoring agencies occurring after January 1, 2011, during the freeze period.  If the State Controller determines that an unauthorized transfer was made during that time, the State Controller must order the sponsoring agency to return the money to the former redevelopment agency or its successor agency.  The sponsoring agency must comply with the order "as soon as practicable."[2]

---

[2]    Health and Safety Code section 34167.5 provides:  "Commencing on the effective date of the act adding this part, the Controller shall review the activities of redevelopment agencies in the state to determine whether an asset transfer has occurred after January 1, 2011, between the city or county, or city and county that created a redevelopment agency or any other public agency, and the redevelopment agency. If such an asset transfer did occur during that period and the government agency that received the assets is not contractually committed to a third party for the expenditure or encumbrance of those assets, to the extent not prohibited by state and federal law, the Controller shall order the available assets to be returned to the redevelopment agency or, on or after October 1, 2011, to the successor agency, if a successor agency is established pursuant to Part 1.85 (commencing with Section 34170). Upon receiving that order from the Controller, an affected local agency shall, as soon as practicable, reverse the transfer and return the applicable assets to the redevelopment agency or, on or after October 1, 2011, to the successor agency, if a successor agency is established pursuant to Part 1.85 (commencing with Section 34170). The Legislature hereby finds that a transfer of assets by a

17

Here, the State Controller has (1) reviewed the asset transfers between the former redevelopment agency and the City, (2) determined that the transfer of $12.5 million to the City was unauthorized under the Dissolution Law (citing *Culver City I*), and (3) ordered the City to return the money to the successor agency. Therefore, the City must return the money.

It is apparent from the Dissolution Law, as a whole, that the Legislature meant for the remedy in these situations to be through the State Controller's asset transfer review process. No similar provision gives DOF authority to reverse transfers between the former redevelopment agency and the sponsoring agency at this stage of the dissolution process—meaning in the ROPS-based distribution of RPTTF funds.

We also see no merit in the claim that, even though the state may have a remedy through the State Controller's Office, DOF does not have a remedy. DOF is a state agency. It is no offense to the people of California if the law is enforced through the State Controller's Office rather than through DOF.

III

*The Dissolution Law Does Not Authorize Successive Reductions of*
*RPTTF Funds to the Successor Agency for the Same Unauthorized Transfer.*

The statutory ROPS system for funding a successor agency's payment of its enforceable obligations is not the proper avenue for correcting a long-past, unauthorized transfer of funds from the former redevelopment agency to the City. The ROPS system is meant to pay enforceable obligations, a clear concern of the Legislature in passing the Dissolution Law, not to give DOF leverage to force a sponsoring agency to repay funds improperly transferred from a former redevelopment agency. The authority to demand return of the funds lies with the State Controller in its asset transfer review process.

---

redevelopment agency during the period covered in this section is deemed not to be in the furtherance of the Community Redevelopment Law and is thereby unauthorized."

18

The Dissolution Law requires the county auditor-controller, twice per year, to distribute from the RPTTF to each successor agency funds "for payments listed in [the successor agency's] Recognized Obligation Payment Schedule . . . ." (Health & Saf. Code, § 34183, subd. (a)(2).) If the funds in the RPTTF are insufficient to pay the successor agency's enforceable obligations, the county treasurer may loan funds to the RPTTF to be distributed to the successor agency "to ensure prompt payments of redevelopment agency debts." (Health & Saf. Code, § 34183, subd. (c); see also Health & Saf. Code, § 34183, subd. (b) [providing for payment of successor agency's enforceable obligations in event successor agency has insufficient funds].) The Legislature intended to provide for payment of the successor agency's enforceable obligations. From this, we may infer that the Legislature did not intend to cripple the successor agency's ability to pay its enforceable obligations by allowing DOF to reduce successive RPTTF distributions to the successor agency to gain leverage against the City to reverse an unauthorized transfer of funds from the successor agency.

With this overview in mind, we turn to DOF's argument that the superior court erred by disapproving successive reductions of $12.5 million to the RPTTF funds requested by the successor agency to pay enforceable obligations listed in ROPS 13-14B and 14-15B. DOF contends: (1) the City has created a "structural imbalance" in the ROPS system by not paying back the $12.5 million, (2) the $12.5 million held by the City is "available" to the successor agency to pay its enforceable obligations, (3) the Dissolution Law does not limit DOF's reductions to ROPS demands to a one-time adjustment, (4) DOF has authority to determine and reclassify funding sources for the successor agency's enforceable obligations, and (5) the superior court's decision is contrary to legislative intent. Some contentions relate to the reduction for the ROPS 13-14B period and others for the ROPS 14-15A period, but we need not differentiate because none of the arguments has merit.

19

A.    *Structural Imbalance Argument*

DOF contends that the City's failure to pay back the $12.5 million to the successor agency leaves a "structural imbalance" in the ROPS system.  As noted above, we agree, but we do not agree that this circumstance allows DOF to reduce successive distributions from the RPTTF by $12.5 million.  That practice of successive reductions for one unauthorized transfer also causes an imbalance because the successor agency does not have enough money to pay its current enforceable obligations.  We therefore do not agree that an imbalance caused by the City's failure to return the $12.5 million justifies successive reductions of $12.5 million from the funds transferred from the RPTTF to the successor agency to pay its enforceable obligations.

B.    *Availability Argument*

When a successor agency prepares its ROPS for each period, it must identify sources of payment for its enforceable obligations.  One of those sources is the RPTTF, "but only to the extent no other funding source is available . . . ."  (Health & Saf. Code, § 34177, subd. (*l*)(1)(E).)  DOF contends that, even though the Dissolution Law does not define "available," the $12.5 million held by the City fits a reasonable description of funds available to the successor agency.  We disagree.

Even though the City acts as the successor agency, the City and the successor agency are legally separate entities.  (*City of Bellflower v. Cohen* (2016) 245 Cal.App.4th 438, 444.)  Nothing in the Dissolution Law makes city funds available to the successor agency for payment of its enforceable obligations.  Therefore, until the City, either voluntarily or by force of law, returns the $12.5 million, those funds are not available to the successor agency.

DOF claims that the successor agency has a duty to demand the return of the funds.  But, even if the successor agency has a duty to demand the return of the funds, those funds would not be available to the successor agency unless the City actually

20

returned them. That has not happened here, so the funds are not yet available under the Dissolution Law to pay the successor agency's enforceable obligations.

As we discussed above, there is a statutory process for ordering the City to return the funds to the successor agency. Once that happens and the funds are returned, the funds will be available to the successor agency to pay its enforceable obligations.

C. *One-time Adjustment Argument*

DOF argues that nothing in the Dissolution Law expressly prohibits DOF from making reductions in successive ROPS periods to the amount of RPTTF funds given to the successor agency. While that statement appears to be true, it does not necessarily justify successive reductions. As noted above, allowing successive reductions to the amount of RPTTF funds made available to the successor agency inhibits the successor agency's ability to pay its enforceable obligations and thwarts the legislative intent to provide for payment of those enforceable obligations. Therefore, the fact that the Dissolution Law does not expressly disallow successive reductions does not impliedly support a conclusion that the Dissolution Law allows successive reductions.

D. *Funding Sources Argument*

DOF contends that the Dissolution Law provides for DOF to determine the funding sources for payment of the successor agency's enforceable obligations. In support, DOF cites Health and Safety Code section 34177, subdivision (m), which provides: "[DOF] shall make its determination of the enforceable obligations and the amounts and funding sources of the enforceable obligations no later than 45 days after the Recognized Obligation Payment Schedule is submitted." This authority to determine the funding sources, however, cannot include funds that are not available to the successor agency for payment of enforceable obligations. As we said, funds held by the City are not available to the successor agency until they are returned to the successor agency. Any other interpretation impairs the legislative intent to provide for actual payment of enforceable obligations.

21

E.    *Legislative Intent Argument*

The Dissolution Law cites as the Legislature's intent the preservation of "the revenues and assets of redevelopment agencies so that those assets and revenues that are not needed to pay for enforceable obligations may be used by local governments to fund core governmental services including police and fire protection services and schools. It is the intent of the Legislature that redevelopment agencies take no actions that would further deplete the corpus of the agencies' funds regardless of their original source. All provisions of this part shall be construed as broadly as possible to support this intent and to restrict the expenditure of funds to the fullest extent possible." (Health & Saf. Code, § 34167, subd. (a).)

DOF argues that this Legislative intent to preserve governmental assets and to achieve that intent by construing the provisions of the Dissolution Law broadly should lead us to adopt its interpretations of the Dissolution Law with respect to "available" funds and "funding sources." As noted, however, DOF's proposed interpretation is too broad because the funds being held by the City are not actually available to the successor agency and reducing successive RPTTF distributions runs the risk of rendering the successor agency unable to pay its enforceable obligations.

DOF contends there is no specific language in the Dissolution Law to address the situation in this case. We disagree. The State Controller's authority to review asset transfers such as the one that took place in this case and to order reversal of transfers specifically addresses the situation in this case. (Health & Saf. Code, § 34167.5.) Because the Legislature provided a statutory solution for the situation in this case, we see no reason to struggle to divine an intent in other parts of the Dissolution Law to accomplish the same thing. Accordingly, an appeal to the intent behind the Dissolution Law does not support DOF's position.

We therefore conclude that the Dissolution Law does not authorize successive reductions in RPTTF distributions for the same unauthorized transfer from the former redevelopment agency to the sponsoring agency.[3]

## DISPOSITION

The judgment is affirmed without prejudice to any remedies available through the State Controller's asset transfer review process.  The parties shall bear their own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(5).)

                                                      NICHOLSON_____, Acting P. J.

We concur:

_____ROBIE_____, J.

_____MAURO_____, J.

---

[3]     Because a final judgment has been entered, which we affirm, we need not consider DOF's further contention that preliminary relief consistent with the final judgment was improvidently granted.