Filed 6/22/21  In re S.T. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re S.T., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. S.T., Defendant and Appellant. | F080753 (Stanislaus Super. Ct. No. 511699) **OPINION** |

APPEAL from orders of the Superior Court of Stanislaus County.  Linda A. McFadden, Judge.

Arthur L. Bowie, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Tia M. Coronado, and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Minor S.T. appeals from the juvenile court's jurisdictional and dispositional orders, which sustained a Welfare and Institutions Code section 602 petition based on the allegations that S.T. committed three counts of first degree murder (Pen. Code, § 187, subd. (a);[1] counts I–III) and one count of robbery (§ 211; count IV), and which committed S.T. to the Department of Corrections and Rehabilitation, Department of Juvenile Justice ("DJJ"), for a maximum term of 75 years to life.

On appeal, S.T. contends the evidence was insufficient to sustain the allegations that he committed first degree murder. We conclude the evidence is sufficient to sustain the allegations and we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

**I.     Initial Proceedings**

On January 20, 2017, the Stanislaus County District Attorney filed an amended juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)), alleging that S.T. committed three counts of murder (§ 187, subd. (a); counts I–III), robbery (§ 211; count IV), second degree burglary (§ 459; count V), and participation in a criminal street gang (§ 186.22, subd. (a); count VI). On the same date, the People filed a motion to transfer the matter to criminal court. (Former Welf. & Inst. Code, § 707, subds. (b), (c).)

A two-day transfer hearing was held on September 12 and September 14, 2018, and the matter was taken under submission for several months. During the pendency of the transfer motion, Senate Bill No. 1391 (2017–2018 Reg. Sess.) took effect on January 1, 2019. As relevant here, Senate Bill No. 1391 removed the authority of the juvenile court to transfer to criminal court a minor who was 14 or 15 years old at the time

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

of the violation, except in circumstances not relevant here.[2]  (Stats. 2018, c. 1012, § 1; see Welf. & Inst. Code, § 707, subd. (a)(2).)

Thereafter, on April 25, 2019, the superior court found Senate Bill No. 1391 unconstitutional and ordered the case transferred to criminal court.  On September 20, 2019, this court issued an alternative writ of mandate, directing the superior court to either vacate its April 25, 2019, ruling or show cause why S.T. should not be granted relief.  (*S.T. v. Superior Court* (Sept. 19, 2020, F079300) [order].)  Thereafter, the superior court vacated its ruling and transferred the case back to juvenile court for further proceedings.

## II. Jurisdictional Hearing

The jurisdictional hearing commenced on January 7, 2020, and continued over the course of four days.  The following evidence was presented.

### A. *The Robbery and Murders*

Vanh Thommvongsa, his wife Phouvieng, and their daughter Nancy[3] ran a market in the city of Modesto for approximately 15 years.  They were fatally shot during a robbery that took place on January 25, 2011.  Vanh, age 55, was found near the front of the store.  He died from three gunshot wounds to his head, neck, and chest.  Phouvieng, age 49, was found in the store's back storage room.  She was shot five times and died from gunshot wounds to her face, left shoulder, chest, right leg, and left hand.  Nancy, age 28, was found in a loft near the back of the store.  She died from a single gunshot that entered her right eye socket and exited her left temple.  There was no evidence the victims were shot at close range.

---

[2] S.T. was 15 years old at the time the violations at issue here occurred.

[3] Because the victims share the same last name, we refer to them by their first names for clarity.

When police arrived on scene, they found Flaming Hot Cheetos and distinctive green candy wrappers strewn on the pavement in front of the store. Both items were also sold inside the store. Inside the store, police found several shell casings for .22-caliber cartridges, as well as bullet fragments.

**B.** *The Investigation*

At approximately 10:45 a.m. on the morning of the incident, a woman parked in the parking lot of a furniture store adjacent to the market observed three men exit a green Honda and enter the furniture store. One of the men was wearing a knit cap with flaps on each side that covered his ears and two balls hanging from each side. After approximately 10 minutes, the men exited the furniture store and returned to their car, which they moved closer to the market. The men then walked toward the entrance of the market and the witness lost sight of them. A few minutes later, two men returned to the Honda and began backing out of the parking spot. When the third man returned and got in the car, they drove off. After the shooting, the witness relayed this information to the police.

Officers later stopped a vehicle matching the witness's description at a fast food restaurant in the city of Ceres. At that time, Oloth Phommahaxay was driving the vehicle, Chris D.[4] was in the front passenger seat, and S.T. was in the rear seat. Phommahaxay was found to be carrying $37 in cash and approximately 12 candies in green wrappers of the same kind sold at the market. S.T. had red and orange powder on his fingers, which an officer described as consistent with his having recently handled Cheetos. The witness from the furniture store identified the Honda as the one she had seen outside the market that morning.

---

[4] Because Chris was a juvenile at the time of the offenses, we refer to him by first name. (Cal. Rules of Court, rule 8.401(a)(2).) No disrespect is intended.

4.

Inside the Honda, officers found more green candy wrappers. Officers also found two black gloves in a rear cup holder in the center console. On the driver's seat they found a knit cap with three fluffy balls on the crown of the cap. In a compartment under the dash, officers found prepaid phone cards similar to those sold at the market. Officers found approximately $32 in loose change in a bag inside the glove box and another approximately $11 in change in an ashtray. Officers found two .22-caliber spent cartridge cases under the right rear seat, one .22-caliber spent cartridge case in a seam between the right rear wheel and rear cargo floorboard, and one .22-caliber spent cartridge case on the right rear wheel hub in the cargo area.

Following a tip, officers searched the garage of a home where they were told a gun used in the incident may have been located. There, they found a Ruger model 10/22 .22-caliber long rifle with two .22-caliber cartridges in the magazine. Ballistics tests revealed that the cartridges found at the market were fired from that rifle. Photographs of the rifle were introduced into evidence and showed that the butt of the rifle had been cut down and wrapped in duct tape.

### C.    *S.T.'s Admissions*

Former Modesto Police Department Detective Terry Seese interviewed S.T. for several hours on the day he was taken into custody.[5] S.T. told Seese that Phommahaxay and Chris picked S.T. up at his house and told S.T. they were going to "do a lick," which S.T. understood meant they would commit a robbery. When S.T. asked how they intended to carry out the robbery, Phommahaxay told him, "[W]e're going to run up in there and we're going to punch them" and "put them to the ground."

When they arrived at the market, S.T., Phommahaxay, and Chris went to the adjacent furniture store to use the restroom and "watch" the market. They eventually left

---

[5] S.T. waived his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436.) Detective Seese testified to S.T.'s statements.

the furniture store and repositioned the Honda in the parking lot, closer to the market. When they entered the market, S.T. stood at the front of the store near a water fountain or water dispenser. Phommahaxay and Chris walked around the market as though they were shopping. Eventually, Phommahaxay picked up a few items and set them on the counter. He then asked S.T. to "take care of" a woman in the loft area of the store, which S.T. understood as meaning to prevent her from calling 911.

As S.T. walked toward the loft area of the store, he saw Phommahaxay remove from his pants a silver rifle with a black handle. S.T. told Detective Seese that he had not seen the rifle prior to that moment.

Near the back of the store, S.T. saw a woman in a back room who had her back toward him. As he began climbing a ladder to the loft area, he heard four gunshots from the front of the store. He then saw the woman from the back room moving toward the front of the store and, when he reached the top of the ladder, he saw a younger woman looking out through a window in the loft toward the floor of the store. He heard another gunshot and sensed something like a piece of wood zoom past his head. At that point, the younger woman collapsed in the loft window. S.T. began to collect loose change from the desk where the young woman was seated and placed it in two rainbow colored baskets. He heard three additional gunshots and dropped one of the baskets of coins. He descended the ladder with the other basket. He saw the older woman on the store floor, and she appeared to be alive. S.T. dragged her toward a wall and tried to prop her up. He then ran out of the store, passing by a man on the floor at the front of the store. S.T. got into the Honda with Phommahaxay and Chris. S.T. believed the man at the front of the store was shot first, followed by the young woman in the loft, and then the older woman in the back of the store.

As they drove away from the market, Phommahaxay handed S.T. the rifle and asked him to " 'check it.' " S.T. unloaded the rifle, removed the magazine, and saw it contained two rounds. He wore gloves while doing this in order to avoid leaving his

6.

fingerprints on the rifle.[6]  S.T. told Detective Seese he did not know what happened to the rifle after that.  He identified the rifle eventually seized by police as the one Phommahaxay had.  He took coins from the rainbow basket and placed them in a plastic bag, then tossed the basket in the trash.[7]

### D. *Closing Argument and Adjudication*

At the conclusion of the hearing, the court heard closing argument, which focused on the applicability of Senate Bill No. 1437 (2017–2018 Reg. Sess.) and then-recent changes to the felony-murder rule.  (See § 189, subd. (e).)  The People argued that S.T. had committed felony murder because he was a major participant in the underlying robbery who acted with reckless indifference to human life.  S.T.'s counsel argued S.T. was not a major participant in the robbery and did not act with reckless indifference to human life.

The court ultimately sustained the allegations in counts I through IV.[8]  With regard to the murders, the court found that S.T. was a major participant in the robbery who acted with reckless indifference to human life.  The court noted that S.T. knew his companions intended to commit a robbery when he got in the car.  He also went with his companions to the adjacent furniture store to scope out the market before the robbery and brought gloves with him to the encounter.[9]  The court also stated it was "[v]ery difficult" to believe S.T. was unaware of the firearm prior to the robbery, and the court opined that S.T. "knew that there was a weapon there."  !(RT 293)!  The court also noted that S.T.

---

[6] Detective Seese could not recall whether S.T. stated that he wore gloves inside the market.

[7] The police later recovered a rainbow basket from the garbage can at a house S.T. identified.

[8] Counts V and VI were dismissed on the prosecution's motion.

[9] S.T.'s counsel interjected that S.T. told Detective Seese he brought the gloves with him because it was cold.  The court responded that "those gloves were a good way to hide the fact that you were involved in the robbery."

7.

understood his companions intended to "punch the people down to the ground," which suggested S.T. shared in their intent to use such force as was necessary to render the victims unable to resist. The court further noted that S.T. initially remained near the door of the market, which prevented anyone from getting out to call for help. S.T. also complied with Phommahaxay's directive to ensure that no one in the loft area called 911, which suggested S.T. was prepared to use "a lot of force" against the victims to gain compliance.

The court also considered S.T.'s conduct once the shooting commenced. At that point, S.T. continued his participation in the robbery by climbing up to the loft and "taking away some of the loot," which, in the court's view, indicated S.T. was not surprised by the shooting. Additionally, the court noted S.T. unloaded the weapon and disposed of unexpended cartridges and, at some point, ate Cheetos. The court opined that the entire event "shows complete reckless indifference to human life," and that S.T. showed no care that anyone was killed.

## III. Disposition Hearing

On February 5, 2020, the juvenile court held a disposition hearing, declared S.T. a ward of the court, and committed him to the DJJ for an aggregate term of 75 years to life, comprised of a term of 25 years to life on each of counts I through III, and a concurrent three-year term on count IV.[10]

### DISCUSSION

## I. Applicable Law

### A. *Sufficiency of the Evidence*

In considering the sufficiency of the evidence in proceedings before the juvenile court, a reviewing court applies the same standard of review that applies in criminal

---

[10] The juvenile court pointed out that S.T. nonetheless would be released at age 25. (See Welf. & Inst. Code, § 607, subd. (b).) The disposition hearing was held a few weeks before S.T.'s 25th birthday.

8.

cases. (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540.) "The test for evaluating a sufficiency of evidence claim is deferential: 'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We must 'view the evidence in the light most favorable to the People' and 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] We must also 'accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' [Citation.]" (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

## B. *Felony Murder After Senate Bill No. 1437*

Effective January 1, 2019, Senate Bill No. 1437 "amended the Penal Code to modify accomplice liability for murder and the felony-murder rule. [Citation.]" (*People v. Gentile* (2020) 10 Cal.5th 830, 841; see Stats. 2018, ch. 1015.) Relevant here, the bill amended the felony-murder rule by adding section 189, subdivision (e):

> " 'A participant in the perpetration or attempted perpetration of [qualifying felonies] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) *The person was a major participant in the underlying felony and acted with reckless indifference to human life*, as described in subdivision (d) of Section 190.2.' " (§ 189, subd. (e), italics added; accord, *Gentile,* at p. 842.)

To be a major participant in the underlying felony, "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder …." (*People v. Banks* (2015) 61 Cal.4th 788, 802 (*Banks*). "The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations]." ' [Citation.]" (*People v. Clark* (2016) 63 Cal.4th 522, 611 (*Clark*).) The following factors may be relevant to a

9.

determination of whether a defendant or, as here, a juvenile, was a major participant in a felony murder: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks,* at p. 803, fn. omitted; accord *Clark,* at p. 611.) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks,* at p. 803.)

Reckless indifference to human life has both a subjective and an objective element. (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.]" (*Ibid.*) " 'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.]" (*Ibid.*) The mere fact that a participant in an armed robbery could anticipate that lethal force might be used is not sufficient to establish reckless indifference. (*Ibid.*)

The following factors may be relevant to whether a defendant displayed reckless indifference to human life:

"Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? [Citation.]" (*Scoggins, supra,* 9 Cal.5th at p. 677.)

A defendant's actions after a shooting may bear on his or her mental state at the time of the shooting but may be less probative if opposing inferences may be drawn from the circumstances. (*Id.* at p. 679.)

## II.    Analysis

### A.    *Major Participant*

Substantial evidence supports the conclusion that S.T. was a major participant in the robbery.

S.T. knew when Phommahaxay and Chris picked him up that they intended to carry out a robbery involving violence. Prior to the robbery, he accompanied Phommahaxay and Chris to the adjacent furniture store to watch the market. He then accompanied them into the market, where he first stood near the entrance and then went to the loft to prevent the woman there from calling 911. He did not hesitate once shots rang out. Instead, he proceeded into the loft where he took coins from the desk where the young woman was seated and mortally wounded. Although he dropped one basket when additional shots rang out, he fled from the scene with the other basket of coins. He later unloaded the rifle and disposed of the basket. Taken together, this conduct constitutes major participation in the robbery. (See *Banks, supra,* 61 Cal.4th at p. 803.) S.T.'s conduct went beyond that of an "ordinary aider and abettor." (*Id.* at p. 802.)

We acknowledge the evidence did not suggest S.T. was the mastermind behind the robbery. Nonetheless, he participated to some extent in the preparations. We also acknowledge the evidence did not suggest S.T. supplied the firearm used in the robbery,

and the evidence was somewhat conflicting as to when S.T. first learned that his companions were in possession of a firearm. Although S.T. claimed he was unaware of the firearm until he was on his way to the loft, the court found this claim not credible, primarily based on the size of the firearm, a photograph of which was entered into evidence. Regardless, however, S.T. was indisputably aware of the firearm as he climbed the ladder into the loft and was at that time aware of his companion's intent to use violence against the victims. At that point, S.T. had an opportunity, albeit brief, to abandon his role in the robbery or to protest the use of the firearm. He did not do so. To the contrary, neither the firearm nor the shooting deterred his participation in the robbery, and he made no effort to prevent the murders. Thus, while some of the *Banks* factors were not present in this case (see *Banks, supra,* 61 Cal.4th at p. 803), those factors carry relatively minimal weight in light of S.T.'s direct and substantial participation in the offense itself.

Accordingly, we conclude the evidence was sufficient to support an inference that S.T. was a major participant in the robbery.

### B.   *Reckless Indifference to Human Life*

Substantial evidence also supports the conclusion that S.T. acted with reckless indifference to human life.

We note that the evidence demonstrating S.T.'s role as a major participant is also relevant to the analysis of whether he acted with reckless indifference. (*Clark, supra,* 63 Cal.4th at p. 615 [although the requirements are stated separately, " 'they often overlap' "].) In particular, S.T.'s physical presence at the scene of the robbery and murders and his failure to make any attempt to prevent the shootings is particularly significant. Our Supreme Court and the United States Supreme Court have "stressed the importance of presence [at the scene] to culpability." (*Id*., at p. 619; see *Tison v. Arizona* (1987) 481 U.S. 137, 158.)   A defendant who is present has " 'an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining

12.

influence, then the defendant is arguably more at fault for the resulting murders.' [Citation.]" (*Clark,* at p. 619.)

We acknowledge that the murders appear to have occurred in quick succession, giving S.T. little opportunity to intervene. However, as we indicated above, in that brief interval, S.T. could have yelled out in warning to the victims, refused to comply with Phommahaxay's directives, demanded that Phommahaxay stop or that they all leave, attempted to distract Phommahaxay, or taken other evasive action. (See *In re Loza* (2017) 10 Cal.App.5th 38, 53–54.) Instead, S.T. proceeded to the loft with the intent to prevent one of the victims from calling 911 and took coins from the desk of the mortally wounded victim, rather than aiding her. Then, as he fled, he unloaded the weapon and ate Cheetos. In other words, S.T.'s response to the shooting did not involve surprise, regret, or remorse, but rather suggested that he found the shootings to be entirely predictable. (See *People v. Douglas* (2020) 56 Cal.App.5th 1, 9–11.) His indifference at having participated in the commission of three murders, combined with his conduct both prior to and during the shooting, is substantial evidence that he acted with reckless indifference to human life.

Lastly, we note that the facts of this case are distinguishable from those in which courts have found the evidence insufficient to support a finding of reckless indifference. Such cases generally involve a defendant who was either a getaway driver, or who was involved in planning the underlying offense but was not present for the killing. (See, e.g., *In re Taylor* (2019) 34 Cal.App.5th 543, 557–559 [evidence insufficient where the defendant planned a robbery and served as the getaway driver]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 404–405, 408, fn. 12 [evidence insufficient where the defendant provided the shooter with a gun at a time when no crime was contemplated, and defendant served as getaway driver but was not present for the murder]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1019–1020, 1023–1026 [defendant planned robbery and was driver, but was not present at the murder scene]; *In re Miller* (2017) 14 Cal.App.5th

13.

960, 964–965, 975–976 [defendant selected robbery target but was not at the murder scene and was unaware a gun would be used].)  Here, S.T. was at least minimally involved in preparing for the robbery, was aware of his companions' intent to use violence, claimed he became aware of the firearm during the course of the robbery, and was present for the robbery and murders.

In sum, substantial evidence supports the court's finding that S.T. committed felony murder as a major participant in the robbery who acted with reckless indifference to human life.

## **DISPOSITION**

The jurisdiction and disposition orders are affirmed.


POOCHIGIAN, J.

WE CONCUR:


LEVY, Acting P.J.


SNAUFFER, J.


14.